**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Samuel Robert SINK and John Edward Grim, Jr., Defendants-Appellants.**

**No. 77–5317.**

United States Court of Appeals,
Fifth Circuit.

Dec. 22, 1978.

James M. Russ, Orlando, Fla. (Court-appointed), for Samuel Sink.

Harry L. Roen, Orlando, Fla. (Court-appointed), for John Grim.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Robert A. Leventhal, Mark Horwitz, Asst. U. S. Attys., Orlando, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, THORNBERRY and CLARK, Circuit Judges.

CHARLES CLARK, Circuit Judge:

Samuel Robert Sink and John Edward Grim, Jr., were convicted by a jury on separate counts of illegal possession of and passing counterfeit obligations in violation of 18 U.S.C.A. § 472 and of conspiring to import counterfeit obligations in violation of 18 U.S.C.A. § 371. Grim and Sink both challenge the validity of the warrantless searches leading to their arrests as well as the sufficiency of the government's evidence on all counts. Additionally, Sink attacks the trial court's refusal to require production of the government agents' reports under the Jencks Act. 18 U.S.C.A. § 3500. We affirm.

The events surrounding defendants' searches were disclosed during a pretrial suppression hearing. On November 16, 1976, in the early afternoon, Secret Service Agents Connelly and Stebbins responded to a security officer's telephone call that suspected counterfeit $50 bills were being passed at a shopping mall in Orlando, Florida. The agents there arrested Michele Creedon, who was found to possess several counterfeit bills. Her companions, another woman and a man, were no longer at the mall, but police shortly apprehended and arrested the male, James Streeter, Jr., who subsequently admitted his involvement with Creedon and implicated Sharon Rhoden as the third counterfeiter operating at the shopping mall. The three were roommates in a local apartment. The agents received further information that Sharon Rhoden returned home that afternoon, then took a cab to Denny's Restaurant where she met and left with an older, well-dressed man with a mustache. They also learned that she had called Streeter's father several times, looking for his son. The elder Streeter did not reveal to her that his son had already been arrested, and Rhoden would not disclose to him her whereabouts.

That night Agents Connelly and Stebbins set up surveillance inside the main entrance to Big Daddy's Lounge, a bar Rhoden and Streeter frequented. Shortly after midnight they spotted her as she entered with a man fitting the description of her companion at Denny's, later identified as defendant Grim.[1] The two walked around the three levels of the bar canvassing the people there, did not socialize or buy drinks, and left. The agents followed and observed them enter an Oldsmobile waiting out front with a driver, later identified as defendant Sink. The car was driven less than a mile north to the Ranch House Restaurant which all three entered. After about twenty minutes, they left with Grim driving, Sink occupying the passenger's seat, and Rhoden sitting alone in the back seat. The agents did not attempt to arrest Rhoden or to deter-

---

1. In fact, her companion had been defendant Sink; however, both men fit the same general description. It was not, therefore, unreasonable for the agents to conclude that she was in the company of the person she met earlier at Denny's.

mine whether counterfeit bills had been passed at either stop. At this time the agents were joined by two plainclothes Orange County policemen driving separate cars. The three unmarked vehicles followed the Oldsmobile for several minutes as it elusively circled through a parking lot and the streets of a residential neighborhood. At one point the Oldsmobile turned from a thoroughfare onto a side street, which made a horseshoe loop and rejoined the thoroughfare. One of the county patrolmen proceeded to the far end of the loop while the other two vehicles followed the path of the Oldsmobile. As the officer entered the far end of the loop street, he passed the Oldsmobile making its exit and radioed to the following cars that it appeared the subjects in the Oldsmobile realized they were being followed. At this point it also became apparent that the Oldsmobile was rapidly picking up speed. When the first of the following cars arrived at the junction of the loop and the thoroughfare, he had lost visual contact with the Oldsmobile but guessed correctly as to the direction in which it had proceeded. After speeding up he regained sight of the subjects. Connelly, who had fallen behind, radioed a request to the local officials to overtake and stop the car to permit his arrest of Sharon Rhoden. The stop occurred at approximately 2 a. m.

When Connelly arrived at the place where the Oldsmobile had been pulled over, he ordered the three occupants out of the car and, while advising Rhoden that she was under arrest, conducted a pat-down search of the driver, Grim. He detected hard objects in Grim's pockets which he feared were cutting-type weapons and had Grim empty his pockets. Among other things, Grim displayed packets of currency, one bill of which Connelly recognized as counterfeit.[2] On the basis of this evidence, Connelly arrested Grim. At the same time, Sink was emptying his pockets after a pat-down by another officer.[3] No counterfeit currency was found on Sink's person, but he was arrested for aiding and abetting the possession and passing of counterfeit currency.

The Oldsmobile was seized pursuant to 49 U.S.C.A. § 782[4] and was inventoried prior to being towed to the Sheriff's department. The officers conducting the inventory observed in the trunk a shoulder bag containing a large sum of money. Fearful of destroying valuable evidence, they secured the vehicle until a subsequent search at the Sheriff's department revealed approximately $31,000 of counterfeit $50 and $100 Federal Reserve Notes in bags in the trunk.[5]

The evidence presented during trial established that defendants Sink and Grim first met in July of 1976. Grim was a jewelry salesman from St. Petersburg and Sink's business related to Auto Care Centers. The two flew from Sink's West Virginia home to Orlando on November 10, 1976, where they met Sink's friends, Sharon Rhoden and Walter Patrick Branche.[6] The next day Rhoden and Branche flew to Bogota, South America, at Sink's invitation, and were joined by Sink and Grim on November 12. On Saturday, November 13, after doing some sightseeing on her own, Rhoden returned to their hotel suite and found Sink, Grim, and Branche talking to a

---

**2.** Grim was actually carrying over $1500.00 in bogus bills. In addition, he had several emeralds, a collection of hotel receipts, and Sink's and his own passport.

**3.** Sink was carrying several hundred dollars in genuine currency, a Bogota business card, and two Orlando phone numbers.

**4.** The relevant portion of this statute permits the government to seize and forfeit any vehicle used to transport, carry, or convey any contraband article which includes counterfeit currency.

**5.** Connelly found in the trunk a paper bag containing a packet of counterfeit currency and some cigarette packages. He also found a shoulder bag, which Grim later identified as his own, containing among other things a package of gum, a packet of counterfeit $50.00 and $100.00 bills, and an Orlando Hilton envelope holding additional counterfeit notes.

**6.** Branche was also named a coconspirator, but his motion for judgment of acquittal was granted at the close of the government's case-in-chief.

bell captain about jewelry, jewelry shops, and jewelry salesmen. Rhoden testified that another Colombian, Alberto Montealegre, whom Sink and Grim had met on the airplane to Bogota, soon arrived, dropped off maps of South America, and arranged to return the next evening to show Sink and Grim the town.

Montealegre testified that in fact he visited Sink, Grim, Branche, and Rhoden in their suite on Sunday morning and unexpectedly acted as an interpreter for Sink and Grim in a transaction with a Spaniard named Rodriquez-Mendez. Montealegre ascertained that Grim was attempting to sell diamonds to Rodriguez, which Rodriquez eventually purchased for $33,000 in American money. In a separate purchase, Grim paid Rodriguez from $550 to $10,000 for emeralds. Grim explained at trial that Sink was going to introduce him to emerald salesmen for a certain fee. He added that he had carried approximately 21 one-carat diamonds and $2000 in United States currency to purchase emeralds. Rhoden testified that she and Grim had left the suite that Sunday morning to go shopping, that they returned, but that she left again, leaving Grim alone in the room. According to her testimony, when she returned one and a half hours later, Grim, Sink, and Branche were in the living room with a pile of American currency. She further testified that she questioned whether Sink had sold any jewelry, to which he responded "no," adding that he and Grim "had just made it." While Sink and Grim began carrying the money into the bedroom, Rhoden slipped about $2500 into her purse without anyone's knowledge. She testified to later seeing the currency in Sink's briefcase, but Grim said the money was in his possession at all times.

The next morning, Monday, November 15, Rhoden and Branche flew to Miami, waited for Sink and Grim who took a later flight, then went on to Rhoden's apartment in Orlando. Once there, she showed her roommates Streeter and Creedon the money she had taken, and divided it with them the next morning before their trip to the shopping mall. Sink and Grim stayed in Miami overnight before flying to Orlando. When they entered the country, both Sink and Grim individually responded to a customs declaration that neither he nor any member of his party was transporting more than 5,000 United States dollars in cash.

Sink rented a car upon their arrival in Orlando, and they made three stops within a two-mile stretch on their way to their hotel. They first stopped at a Tenneco station where Grim was identified as the purchaser of a carton of cigarettes and a box of facial tissues. The items were paid for with a counterfeit $50 bill. The two next stopped at a Majik Market where one of them went inside for two more cartons of cigarettes and a pack of chewing gum. The cashier identified Sink as the man who made the $6.00 purchase with a counterfeit $50 bill, although Grim testified that he himself was the purchaser in this instance. Finally, they stopped at another Tenneco station, this time to purchase $10.00 worth of gasoline with $50 taken from a "wad" of $50 and $100 bills in his right-hand pocket and placed the change in his left-hand pocket.

When they arrived at their hotel, Sink arranged to meet Rhoden at a Denny's Restaurant where she expressed concern about her friends' disappearance from the shopping mall. Sink related the matter to Grim, who was waiting outside Denny's; they made a few phone calls looking for Streeter, then dropped Rhoden off at home. Before they picked her up again that evening on their way to Big Daddy's Lounge, Grim testified that he alone, without Sink's knowledge, put the bulk of the remaining $33,000 in the cigarette bag and in his shaving kit, and locked both in the trunk of their rented Oldsmobile. He kept the remaining $1500 to $2500 on his person.

## I. THE SEARCHES

█ The ultimate standard for measuring the validity of searches under the fourth amendment is reasonableness. Warrantless searches are per se unreasonable; however, the government may show that

the facts fall within one of the narrow, judicially defined exemptions from the warrant requirement. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *United States v. Cristancho-Puerto,* 475 F.2d 1025 (5th Cir.), *cert. denied,* 414 U.S. 869, 94 S.Ct. 181, 38 L.Ed.2d 115 (1973). In determining the reasonableness of warrantless searches, the central requirement is to examine the totality of the circumstances in light of established fourth amendment principles to determine if the rights which those principles embody have been violated.

■ This circuit has upheld warrantless searches as constitutionally reasonable where there exists both probable cause to make the search and exigent circumstances. *United States v. Gaultney,* 581 F.2d 1137 (5th Cir. 1978). Warrantless searches of automobiles have been upheld in circumstances less demanding than those necessary for the protection of the person or other types of property. *Preston v. United States,* 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777. The mobility of motor vehicles has been cited as one reason for a less rigorous warrant requirement. *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Cooper v. California,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). The Court has also considered the diminished expectation of privacy with respect to automobiles. *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). Although there may be some dispute as to whether exigent circumstances are always required,[7] probable cause to make the search is a constant prerequisite. *See, e. g., United States v. McLaughlin,* 578 F.2d 1180 (5th Cir. 1978).

■ There is no question that the officials following Sharon Rhoden were justified in stopping the Oldsmobile to effectuate her arrest. In order to determine the reasonableness of their actions toward the defendants Sink and Grim, we must view the situation in the light of the officers' collective knowledge on that evening when they stopped the vehicle. *United States v. Edwards,* 577 F.2d 883 (5th Cir. 1978). At that time, the facts known to them webbed a significant relationship between Sharon Rhoden, a passenger in the car, who was known to have passed counterfeit bills earlier in the day; James Streeter, Jr., who was in custody for passing counterfeit bills with Rhoden that afternoon, and for whom Rhoden and her companions were apparently searching that night; the Oldsmobile, an out-of-town rented vehicle, which was known to be carrying a suspected felon, being driven through the streets of Orlando in a nonsensical if not diversionary manner, then accelerated in an apparent attempt to evade the following officers; Grim, who was thought to be Rhoden's companion at Denny's shortly after she became concerned about her friends' disappearance from the mall, who accompanied her through Big Daddy's Lounge and to the Ranch House Restaurant as they appeared to continue to search for Streeter, and who, as driver of the car at the time of arrest, was apparently attempting to protect Rhoden from apprehension; and Sink, who was seen waiting behind the wheel of the Oldsmobile for Rhoden and Grim outside Big Daddy's Lounge and who accompanied him in their apparent search for Streeter. Additionally, the counterfeit bills in Grim's possession revealed by his pat-down added to the officers' reasonable belief that the vehicle contained contraband.

■ We do not agree with Grim's assertion that his fourth amendment rights have been transgressed by that pat-down. Limited pat-down searches of the person have been justified by balancing the need to search or seize against the invasion which results. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The balance struck in *Terry* permits "a reasonable search for weapons for the protection of the

---

7. *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *United States v. McLaughlin,* 578 F.2d 1180 (5th Cir. 1978); *United States v. Morris,* 565 F.2d 951 (5th Cir. 1978).

**1048**

police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry v. Ohio,* 392 U.S. at 27, 88 S.Ct. at 1883. Such a limited intrusion does not violate the fourth amendment if the searching officer can point to specific and articulable facts suggesting actual physical risk to himself or others. Seasoning the above delineation of objective facts with the serious nature of the counterfeiting offense and the late hour of the stop, we find that the officers' fear that Rhoden's companions were armed and dangerous constitutionally justified the pat-down search of Grim. *United States v. Tharpe,* 536 F.2d 1098 (5th Cir. en banc 1976). The items revealed by the simultaneous pat-down of Sink did not contribute to probable cause for his arrest or search of the car nor prejudice his defense. We do not reach Sink's challenge to its validity.

█ The conjunction of defendants' behavior in Rhoden's presence during the period of surveillance, the counterfeit bills in Grim's possession revealed by the pat-down, and other evidence known to the agents provided the officers with probable cause to search the Oldsmobile.[8] *United States v. Edwards,* 577 F.2d 883 (5th Cir. 1978). Without deciding whether a diminished expectation of privacy made it unnecessary for the officers to also be confronted with exigent circumstances,[9] we find that the facts of this case satisfy this requirement. *See Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

█ These same facts provide an alternative authority for searching the Oldsmobile, the federal forfeiture statute, 49 U.S.C.A. § 782. This circuit has not yet determined the scope of this law. *United States v. Gaultney, supra.* However, it has been interpreted as authorizing the seizure of a vehicle upon a finding of probable cause to believe that the vehicle has been or is being used to transport contraband. *United States v. Zaicek,* 519 F.2d 412 (2d Cir. 1975). We adopt this rationale. Since the behavior of the three individuals that evening positively connected the vehicle with Rhoden's illegal activities and thereby established the requisite probable cause, an inventory search following seizure under authority of this statute would be legal.

## II. SUFFICIENCY OF THE EVIDENCE

█ In the context of an appellate procedure to review the sufficiency of the evidence supporting defendants' convictions, our position is to view the trial evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and to make all credibility choices and inferences in support of the jury's verdict. *United States v. Black,* 497 F.2d 1039 (5th Cir. 1974); *Gordon v. United States,* 438 F.2d 858 (5th Cir. 1971), *cert. denied,* 404 U.S. 828, 92 S.Ct. 139, 30 L.Ed.2d 56, *reh. denied,* 404 U.S. 960, 92 S.Ct. 312, 30 L.Ed.2d 279 (1971). It is the responsibility of the government to prove every element of the offense beyond a reasonable doubt. In a case such as the one before us, circumstantial evidence plays a crucial role in the government's proof. Yet the test does not vary in judging the sufficiency of direct or circumstantial evidence. The legal test is whether a jury could conclude that the evidence and its inferences are inconsistent with every reasonable hypothesis of innocence. *United States v. Gomez-Rojas,* 507 F.2d 1213 (5th Cir.), *cert. denied,* 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975). That is, "a motion of acquittal must be granted when the evidence, viewed in the light most favorable to the Government, is such that a reasonably minded jury *must* have a reasonable doubt as to the existence of the essential elements of the crime charged." *United States v. Barrera,* 547 F.2d 1250, 1255

---

8. This includes the search of the paper sack and shoulder bag. *United States v. Montgomery,* 558 F.2d 311 (5th Cir. 1977), makes clear that *United States v. Chadwick, supra* note 7, does not apply to this 1976 search.

9. *See United States v. Gaultney,* 581 F.2d 1137, 1148 (Gee, J., concurring).

(5th Cir. 1977), *quoting, United States v. Reynolds*, 511 F.2d 603 (5th Cir. 1975). We conclude that the jury had sufficient evidence before it to convict both Sink and Grim on all counts. It is necessary to consider each of those counts and the evidence proffered regarding its essential elements in reaching this conclusion.

*Grim*

■ Grim was charged with possession of counterfeits found on his person and in the automobile he was driving at the time of his arrest, with uttering and publishing a counterfeit $50 Federal Reserve Note at the Tenneco service station in Orlando, and with conspiracy to bring counterfeit obligations into the United States. The essence of the passing and possession charges, beyond those physical acts, is an intent on the part of the actor to defraud. 18 U.S.C.A. § 472. Proof of the mere fact of passing or possessing is insufficient. *United States v. Jiminez-Serrato*, 451 F.2d 523 (5th Cir. 1971); *Paz v. United States*, 387 F.2d 428 (5th Cir. 1967). But surrounding circumstances often supply inferences of knowledge which adequately prove intent. *United States v. Haggins*, 545 F.2d 1009 (5th Cir. 1977). For example,

> Guilty knowledge can . . . be inferred from a rapid series of passings, *e. g., Ruiz v. United States*, 374 F.2d 619 (5th Cir. 1967); *United States v. Releford*, 352 F.2d 36 (6th Cir. 1965), or where counterfeit is passed at several different establishments, *e. g., Marson v. United States*, 203 F.2d 904 (6th Cir. 1953) . . . . Use of large counterfeit bills rather than change received in prior purchases is also highly probative of guilty knowledge, *see Carrullo v. United States*, 184 F.2d 743 (8th Cir. 1950), as is an attempt to destroy or abandon counterfeit currency when capture is imminent, *see e. g., United States v. King*, 326 F.2d 415 (6th Cir. 1964); *United States v. Kelley*, 186 F.2d 598 (7th Cir. 1951).

*United States v. Haggins, supra* at 1013.

■ There is no doubt that Grim was in possession of the counterfeit bills found during the legal searches of his person. He admitted to possession of those found in the automobile the night of his arrest. Similarly, we believe the evidence sufficiently established that he passed a counterfeit $50 bill in exchange for facial tissues and cigarettes at the Tenneco station. Grim does not challenge the fact of possession but denies any guilty knowledge of the bills' quality. It is true that defendants' trip to Bogota is amenable to an explanation consistent with Grim's jewelry-trading business. But we are not convinced that the jury could not reasonably exclude such an innocent hypothesis in light of Grim's failure to declare the bills at customs, Sink and Grim's three successive passings at roadside stops followed by the secreting of the currency once the possibility of their discovery was realized, and their eventual elusive driving tactics apparently aimed at protecting Rhoden from apprehension.

*Sink*

■ Sink was charged with possession of the counterfeits found in the trunk of the Oldsmobile, with uttering and publishing counterfeit $50 Federal Reserve Notes at a Tenneco station and a Majik Market, and with conspiracy to bring counterfeit obligations into the United States. We find that there was adequate evidence at trial for the jury to identify Sink as the man who passed the two counterfeit notes. Although there was disputed testimony regarding who actually made the purchase at the Majik Market, we cannot say that the jury's conclusion, based on the credibility and demeanor of the witnesses as they spoke at trial, was incorrect as a matter of law. As to Sink's knowledge of the false nature of the money, we are unable to find innocent inferences in his complicity with Grim, whereby he financed the trip of his girlfriend, Rhoden, to South America, aided in a succession of acts passing large denominations of currency upon landing in Orlando, and was party to an attempt to evade law enforcement officers once his activities were apparently exposed.

Sink further argues that he was not in possession of the notes found in the Oldsmobile. However, constructive possession, shown by ownership, dominion, or control over the contraband itself or over the vehicle in which the contraband was concealed, will support a conviction. *United States v. Salinas-Salinas*, 555 F.2d 470 (5th Cir. 1977). Although Sink did not own the Oldsmobile, he rented it in his name and drove it interchangeably with Grim while they stopped at the roadside markets and again when they later helped Sharon Rhoden search for Streeter. Grim's testimony that he did not tell Sink that he packed the money in the trunk may point to Sink's lack of knowledge but it is not conclusive, and the jury was not compelled to believe Grim's testimony when confronted with other suspicious activity on Sink's part.

*The Conspiracy*

Essential to a criminal conspiracy are an agreement among the conspirators to commit an offense against the United States attended by an overt act of one of them in furtherance of the agreement. *United States v. Bright*, 550 F.2d 240 (5th Cir. 1977). There is abundant evidence supporting the overt acts of flying from West Virginia to Bogota to Orlando. Again, however, resort must be had to circumstantial evidence to infer the existence of an intent to enter into an unlawful agreement. Defendants urge the legitimate nature of their relationship to trade jewels as a valid explanation for the trip to Bogota. Many factors dissuade us of an innocent purpose to the trip from which they returned with $33,000 in counterfeit obligations. First, neither Sink nor Grim declared that he or his travel companion were carrying over $5,000 through customs. Furthermore, while it is true that they did not begin spending the money when they first arrived in Miami, they did pass three large bills in rapid succession immediately upon landing further inland. Also, once they learned from Rhoden that her roommates may have been apprehended while spending the money, they ceased their spending and put most of the cash in the trunk of the car. Finally

after attempting to evade detection, when they were pulled over by the agents, one of them observed that they had "had it."

Nevertheless, Sink continues to argue that he was an innocent accomplice to what he thought was an honest jewel transaction. It is not disputed that a conviction upon the basis of association alone may not stand. *United States v. Tyler*, 505 F.2d 1329 (5th Cir. 1975). But Sink's activities adequately supply proof independent of his mere association with Grim to support this conspiracy conviction. Although there is no evidence of Sink's background in the jewel business, testimony indicated that he was to introduce Grim to jewel traders in Bogota. It is not unreasonable therefore to assume his knowledge in the nature of the consummated transaction. Additionally, by all accounts he was present during the "deal" and helped pack the money. Because the evidence showed that his activities exceeded those of a naive associate, we can not overturn the jury's conviction.

## III. JENCKS ACT

During Agent Stebbins' testimony at trial, it became apparent that he had prepared a report in connection with his investigation of the case, and that the arresting agent, Connelly, who also testified at trial, had endorsed it. The trial court denied Sink's request for its production. We remanded this issue for further proceedings to determine whether the Jencks Act, 18 U.S.C.A. § 3500, or *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), required the government to produce the case report. *United States v. Sink*, 575 F.2d 485 (5th Cir. 1978). The subsequent hearing disclosed that a synopsis of events, known as a memorandum report, was prepared by Agent Stebbins from his notes and recollection of interviews with various witnesses. Although the trial court found the memorandum report to be a Jencks Act statement as to the author Agent Stebbins and as to Agent Connelly who verified its accuracy, the court concluded that the failure of the government to produce the report was

harmless error since its contents do not substantially deviate from the agents' trial testimony. Furthermore, the court determined that the report is not Jencks Act material as to the witness Sharon Rhoden because it does not contain her statements verbatim, and she did not read, approve, or otherwise adopt it. Finally, the court denied a new trial on *Brady* grounds since Sharon Rhoden's statements, although possibly tending to impeach her, were so extremely inculpatory of defendants Sink and Grim that it was not conceivable that they would have made any use of them.

 In a federal criminal action, the prosecution must supply defendant with any statement in its possession of a witness who has testified on behalf of the government. 18 U.S.C.A. § 3500(b). Under the Jencks Act definition of a "statement" as "a written statement made by said witness and signed or otherwise adopted or approved by him; . . ." 18 U.S.C.A. § 3500(e)(1), the memorandum report was clearly a "statement" as to Agents Stebbins and Connelly. Yet, comparing the report and the agents' trial testimony discloses no substantial deviation. Therefore we agree with the trial court that the government's failure to produce the report at trial was harmless error. *Cf. United States v. Beasley*, 576 F.2d 626, 630 (5th Cir. 1978).

To demonstrate error, defendant Sink refers to two instances in which the agents' report was inconsistent with Connelly's testimony.

Connelly testified on direct examination that he identified himself to the driver of the Sink automobile *prior* to ordering the driver to exit from the car when it was stopped during the late night hours of November 16, 1976 . . . and he also testified that he ordered the Sink automobile seized pursuant to the federal forfeiture statute . . . . However, in the reports no mention is made that the Sink automobile was ordered seized by the federal agents prior to its "inventory" by Orange County, Florida, deputy sheriffs. In addition, it is stated in the [memorandum report] that Connelly advised the individuals in the Sink automobile of his identity *after* the driver exited the vehicles and was searched by Connelly.

 We fail to see how access to such minor discrepancies could have been of any real value to Sink even for impeachment purposes.[10] Our examination of the excluded reports in this case reveals no other differences which would tend to prejudice defendant Sink. The trial court also correctly determined that the report was not a Jencks Act "statement" as to Sharon Rhoden. *United States v. Judon*, 581 F.2d 553 (5th Cir. 1978).

 Sink alternatively submits that the failure of the government to disclose the summaries of Rhoden's statements that were contradictory and inconsistent with her trial testimony denied him due process and a fair trial under the rule announced by the United States Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Court in that case held that the due process clause of the fourteenth amendment forbids the government, in a criminal case, from suppressing requested evidence favorable to an accused, where such evidence is material either to guilt or to punishment, irrespective of the good faith or the bad faith of the prosecution. *Brady v. Maryland, supra*, 373 U.S. at 87, 83 S.Ct. at 1196. This circuit has held that a successful *Brady* claim rests on proof of three factors: (1) the prosecution's suppression of evidence; (2) the favorable character of the suppressed evidence for the defense; (3) the materiality of the suppressed evidence. *United States v. Anderson*, 574 F.2d 1347 (5th Cir. 1978).

The memorandum report refers to statements by Rhoden which differed somewhat

---

10. By comparison, the undisclosed letter found to be harmless error by a majority of the United States Supreme Court in *Rosenberg v. United States*, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1034 (1959), contained statements by a key government witness that as time progressed she was less clear in her memory of the whole transaction and feared she would not fare well during cross-examination.

from her testimony at trial. Her statements to the agents in those initial interviews revealed a greater knowledge on her part of the illicit nature of her trip to Bogota with Sink, Branche and Grim. For example, the following account of her recollection of the jewel transaction in Bogota differed considerably from her trial testimony which is recapped above:

> On the morning of 11/14/76, Sink and Branche left the hotel together for an unknown destination. She remained behind with Grim. Branche and Sink returned later with a great deal of money in their pockets, in denominations of $50 and *$100* bills. Grim hugged Sink and appeared to be very happy. Sink said the money was beautiful *and that it was just made. It was at that point that Rhoden knew that the money was counterfeit.* She said that everyone sat around checking the money for defective bills. She noted that on some of the bills the quadrant number hit the serial number. These bills were rejected. Their disposition is unknown. They inspected, counted and put the money into packets of $1,000 *and wrapped with $1,000 currency wrappers.* * * *

The trial court denied *Brady* relief because it determined that such discrepancies in testimony could not have been put to favorable use by defendant Sink since it damningly linked him to the counterfeit conspiracy. This is apt reasoning.

▪ Even if we were to assume that the evidence was favorable, no new trial would be warranted since it was not material. In *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the United States Supreme Court recognized that *Brady* materiality had to be judged in several distinct situations in which the issue might arise. One such category includes situations as here where during trial, defense counsel requests a specific item which is refused. In such cases, the Supreme Court found "implicit in the requirement of materiality . . . a concern that the suppressed evidence might have affected the outcome of the trial." *United States v. Agurs, supra,* 427 U.S. at 104, 96 S.Ct. at

2398. The prosecutor, who with Agents Connelly and Stebbins questioned Rhoden initially, had made his own lengthy notes of these interviews. His notes were disclosed to Sink prior to cross-examination. The agent's report would have added nothing of substance to these notes. Sink argues that if the report had been disclosed, Rhoden could have corroborated a conversation concerning a meeting with Rodriguez. However, the trial transcript reveals a thorough examination on this point. Reviewing all of Sink's claims in light of the substantially duplicating information furnished in the form of the prosecutor's notes, we conclude there was no error in the government's refusal to furnish the agents' report. Because Sink's prior access to this report could not have affected the outcome of the trial, the report was not material.

AFFIRMED.