UNITED STATES of America,
Plaintiff-Appellee,

v.

Anthony David HARRIS,
Defendant-Appellant.

No. 83–3365.

United States Court of Appeals,
Fifth Circuit.

March 5, 1984.

Rex Rainach, Baton Rouge, La., Court-appointed, for defendant-appellant.

James Stanley Lemelle, Asst. U.S. Atty., Baton Rouge, La., for plaintiff-appellee.

Before REAVLEY, TATE, and GARWOOD, Circuit Judges.

TATE, Circuit Judge:

The defendant Harris was convicted, after a jury trial, of five counts relating to conspiracy and uttering and dealing in counterfeit obligations in violation of 18

U.S.C. §§ 371, 472, 473, 2, 3, and 4.[1] He received concurrent sentences on Counts I through IV, and the imposition of sentence of imprisonment on Count V was suspended.

By his appeal, the defendant raises three contentions: (1) that the trial court erred in failing to suppress evidence (33 counterfeit $100 bills) removed without a search warrant from Harris's automobile six days after his arrest; (2) that the trial court erred in admitting into evidence other counterfeit $100 bills because the government failed to prove the chain of custody; and (3) that Harris's sentence, on Count I of the judgment, to incarceration until payment of his fine, violates his constitutional rights. Finding arguable merit to his contentions as to the admissibility of the counterfeit bill used to prove Count II, we vacate Harris' conviction on that count upon application of the concurrent sentence doctrine. We affirm, however, his convictions on the other four counts, rejecting his contentions thereasto.

*Factual Context*

The offenses charged arise out of two separate incidents, one on November 8, 1982, and one on November 16.

On November 8, 1982, Harris and a female companion, Glenda Benoit, entered the Swiss Colony store in the Cortana shopping mall in Baton Rouge, where Harris purchased two items and tendered a $100 bill in payment. Within thirty minutes of the purchase, the store's manager discovered that the bill was counterfeit. At trial the Swiss Colony employee who had accepted the $100 bill, testified that it was Anthony Harris who had tendered a $100 bill to her, which had been at the time identified by her manager as counterfeit. She could not, however, identify the bill actually offered in evidence as the one presented to her.

On November 16, 1982, Harris purchased $3,000 in counterfeit $100 bills for approximately $900 from Moise Domino in Baton Rouge. Harris, together with two companions, Brett Burns and Georgia Pierre, then proceeded in the defendant's car to Cortana Mall in Baton Rouge for the second time. Before arriving at the shopping center, Harris gave three $100 bills to Pierre. Harris's car was left in the parking lot, while Harris and Pierre went into the shopping center. At the mall, Harris and Pierre first tried to negotiate one of the bills at Cole's

1. § 371 provides that

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

§ 472 provides that

Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or with like intent brings into the United States or keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both.

§ 473 provides that

Whoever buys, sells, exchanges, transfers, receives, or delivers any false, forged, counterfeited, or altered obligation or other security of the United States, with the intent that the same be passed, published, or used as true and genuine, shall be fined not more than $5,000 or imprisoned not more than ten years, or both.

§ 2 provides that

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

§ 3 provides that

Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact.

§ 4 provides that

Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined not more than $500 or imprisoned not more than three years, or both.

Bookstore to purchase books. The clerk refused to accept the bill and notified a mall security officer of the event.

Harris and Pierre then entered the General Nutrition Center, where the defendant was more successful. The clerk accepted a $100 bill tendered for the purchase of vitamins and agreed to change a second $100 bill. When the two left the store, Ronald Skinner, a mall security officer entered to inspect the two $100 bills and noted that the two bills had identical serial numbers. Skinner then detained Harris and Pierre, advised them of their rights, and requested them to accompany Skinner and another security officer to their office to wait for the Baton Rouge police.

In the security office, Harris consented to the search of his car,[2] claiming that because he was on vacation he did not want any further delay. Upon inspection of Harris's automobile, Officer Paixio of the Baton Rouge police found a .44 Luger pistol, a pair of rubber gloves, several items purchased by Harris, and $2,000 in genuine currency, but no counterfeit bills. After seizing the gun and the cash and placing the other items in the trunk of the car, the automobile was locked and placed under guard until the next day when Secret Service agents again searched the vehicle. At that time, the agents discovered various items, and receipts indicating that many of the items had been purchased with $100 bills.

The issue raised on appeal concerns the invalidity of a search six days later, on November 22, 1982. Then, a secret service agent again searched Harris's car (apparently more thoroughly this time), and discovered thirty-three counterfeit $100 bills hidden under the battery, all bearing the same serial number as the three $100 bills recovered on November 16 at Cortana Mall. The defendant Harris contends that these thirty-three counterfeit bills were improperly admitted into evidence, as the product of a warrantless search.

After a jury trial, Harris was found guilty of the five counts with which he was charged in the indictment. Specifically, Harris was found guilty of (1) conspiracy to distribute counterfeit obligations (Count I), (2) passing a counterfeit bill to the Swiss Colony Store on November 8 (Count II), (3) passing two counterfeit bills to the General Nutrition Center on November 16 (Count III), (4) possession and concealment of thirty-three counterfeit $100 bills on November 16 (Count IV), and (5) transferring and delivering three counterfeit bills to Georgia Pierre on November 16 (Count V).

Harris was sentenced to five years and a $10,000 fine on Count 1 with the instruction that the "defendant shall stand committed until payment of the fine."

On his appeal, Harris raises three contentions: I. That the thirty-three $100 counterfeit bills seized as a result of the warrantless search of his automobile on November 22, six days after his arrest, should have been suppressed; II. That four other counterfeit $100 bills were erroneously admitted

---

**2.** On appeal, the defendant argues that neither Harris nor Pierre gave consent to search the car to any law enforcement officer at any time, whatsoever. The magistrate found (when considering the defendant's motion to suppress) that the weight of the evidence indicated that the defendant freely and knowingly consented. While it is unclear whether Harris's consent was volunteered or given in response to the request of a police officer, both the security officer and the police officers testified that Harris verbally gave permission for the car search. Detective Paixao of the Baton Rouge City police testified that when asked if the police could search his car, Harris responded, "Yeah, I don't want to be delayed. I'm on vacation. Call the bank." Harris's companion Pierre testified that she did not hear Harris consent to a search, but Harris and Pierre were separated at various times during this period of detention. In a similar factual setting, this circuit recently affirmed a district court's finding of consent. The defendant in *United States v. $64,000.00 in U.S. Currency,* 722 F.2d 239, at 245 (5th Cir. 1984), did not recall giving her consent, although two agents testified that consent was given. We determined that the district court's finding of consent was not clearly erroneous. The same rationale would apply here. However, no objection is urged on appeal as to any evidence introduced as a result of this first search, and for present purposes the argument is only that there was no continuing consent that likewise validated as consensual the search six days later, an issue we do not reach. *See* note 3 *infra.*

into evidence, because an inadequate chain of custody was proven to connect them with Harris' alleged offenses; and III. That the sentence of imprisonment until payment of the fine violates his constitutional rights.

## I. Search of November 22 and Seizure of Harris's Automobile

Harris contends that because the thirty-three counterfeit bills, taken from his car in the search conducted six days after his arrest, were seized by a search conducted without a warrant, and because the government failed to prove that any exception allowed a warrantless search, the evidence seized should be excluded. Because we find that the warrantless search was valid due to prior seizure of the automobile as used in the transportation of contraband, we need not determine whether this search six days after the arrest could have been upheld as a valid consensual search, as contended below.[3]

**3.** Thus, we need not determine whether the magistrate properly applied *United States v. White,* 617 F.2d 1131, 1134 (5th Cir.1980) (upholding a vehicle search conducted two days after the defendant consented in writing, where there was no withdrawal of consent or prejudice to the defendant occasioned by the delay). Nor need we address the government's contention that the search was justified as an inventory search.

**4.** 49 U.S.C. § 781 provides in pertinent part:
§ 781. *Unlawful use of vessels, vehicles, and aircrafts; contraband article defined.*
(a) It shall be unlawful (1) to transport, carry, or convey any contraband article in, upon, or by means of any vessel, vehicle, or aircraft; (2) to conceal or possess any contraband article in or upon any vessel, vehicle, or aircraft, or upon the person of anyone in or upon any vessel, vehicle, or aircraft to facilitate the transportation, carriage, conveyance, concealment, receipt, possession, purchase, sale, barter, exchange, or giving away of any contraband article.
(b) As used in this section, the term "contraband article" means—
\* \* \* \* \* \*
(3) Any falsely made, forged, altered, or counterfeit coin or obligation or other security of the United States or of any foreign government; or any material or apparatus, or paraphernalia fitted or intended to be

■ A vehicle used to transport contraband, including counterfeit money, is subject to seizure and forfeiture. 49 U.S.C. §§ 781, 782.[4] Additionally, agents designated by the Secretary of the Treasury, including (as here) secret service agents, are authorized to seize such vehicle and to retain custody of it, awaiting forfeiture pursuant to these statutory provisions. 49 U.S.C. § 783.[5]

While these statutes do not expressly authorize a search, other circuits have held that, when a car is seized by federal agents who have probable cause to believe that it is or has been used to transport contraband, the agents may summarily seize it pursuant to 49 U.S.C. §§ 781–83 and search it without a warrant, under circumstances where the seizure has been virtually concurrent with the use of the vehicle for the shown purpose of transporting contraband and is an immediate consequence of the vehicle's use for such purpose. *United States v. Capra,* 501 F.2d 267, 280 (2d Cir.1974);

used, or which shall have been used, in the making of any such falsely made, forged, altered or counterfeit coin or obligation or other security.
49 U.S.C. § 782 provides in pertinent part:
§ 782. *Seizure and forfeiture*
Any vessel, vehicle, or aircraft which has been or is being used in violation of any provision of section 781 of this title, or in, upon, or by means of which any violation of said section has taken or is taking place, shall be seized and forfeited.

**5.** 49 U.S.C. § 783 provides:
*Designation of officers by Secretary of Treasury; duties of officers*
The Secretary of the Treasury is empowered to authorize, or designate, officers, agents, or other persons to carry out the provisions of this chapter. It shall be the duty of any officer, agent, or other person so authorized or designated, or authorized by law, whenever he shall discover any vessel, vehicle, or aircraft which has been or is being used in violation of any of the provisions of this chapter, or in, upon, or by means of which any violation of this chapter has taken or is taking place, to seize such vessel, vehicle, or aircraft and to place it in the custody of such person as may be authorized or designated for that purpose by the Secretary of the Treasury, to await disposition pursuant to the provisions of this chapter and any regulations issued hereunder.

*United States v. Young,* 456 F.2d 872, 874 (8th Cir.1972); *United States v. Stout,* 434 F.2d 1264, 1267 (10th Cir.1970); *Sirimarco v. United States,* 315 F.2d 699, 701 (10th Cir.1963).

In *United States v. Sink,* 586 F.2d 1041, 1048 (5th Cir.1978), we found, likewise, that 49 U.S.C. §§ 781–83 authorized the seizure and search without a warrant of a vehicle under such circumstances, when the government agents had probable cause to believe the vehicle had been or was being used to transport contraband. There, however, we upheld only the consequent *inventory* search and discovery of counterfeit money in the vehicle so seized—and, at least for present purposes, we will concede the defendant's argument that the present search (six days after the arrest, and after two prior unsuccessful searches), in which the agents discovered thirty-three counterfeit bills taped underneath the battery beneath the hood of the vehicle, cannot be characterized as an inventory search.

■ Nevertheless, the rationale of *Sink* [6] justifies our holding, in accord with other circuits, that a seizure of a vehicle upon probable cause as subject to forfeiture because it was being used to transport contraband, carries with it the right to conduct a warrantless search of the vehicle if properly so seized, at least where the seizure is virtually concurrent with the use of the vehicle for the shown purpose of transporting contraband and is an immediate consequence of the vehicle's use for such purpose.

We are reenforced in this conclusion by *Cooper v. California,* 386 U.S. 58, 60–63, 87 S.Ct. 786, 790–91 (1967). There, the Supreme Court has spoken to the same problem, albeit arising under a state forfeiture statute, in upholding a warrantless search conducted one week after the defendant

and his automobile were taken into custody. The Court noted that a seizure based upon a contraband statute is unlike a seizure that is incident to arrest on an unrelated charge, where the arresting officer, in the exercise of prudent judgment, may seize the car rather than just leave it on the street. *Id.* at 791. *Cooper* found that, in the contraband-seizure case, "the subsequent search of the car was clearly related to the reason petitioner was arrested, the reason his car was imprisoned, and the reason it was being retained." *Id.* It would be unreasonable to hold, the Court felt, that the police additionally needed to obtain a search warrant in order to later examine the car. *Id.* The Court essentially held that, with regard to a vehicle seized under such circumstances, the "search of a car validly held by officers for use as evidence in a forfeiture proceeding" could not be held "unreasonable under the Fourth Amendment." *Id.*

■ Probable cause was shown to seize the vehicle as having been immediately used for the transportation of contraband, *i.e.,* counterfeit bills. Harris and his companion had just been arrested for passing counterfeit bills, self-evidently so because all three bills contained identical serial numbers. Harris had admitted to the arresting officers that his vehicle was the mode of transportation used by him to go to the Cortana Mall, where he had with his companion just passed three counterfeit bills. Nor is there substantial question but that the vehicle was seized by the officers involved (the mall security officers, the Baton Rouge City police, and the secret service agents, working in conjunction) in compliance with the statutory authority to seize the vehicle as having been immediately used in the transportation of the contraband.[7]

---

6. In *Sink,* we adopted the rationale, 586 F.2d at 1048, of *United States v. Zaicek,* 519 F.2d 412 (2d Cir.1975). In that decision, the Second Circuit cited decisions allowing warrantless search of vehicles seized under the forfeiture statutes upon probable cause to believe that the vehicle was being or had been used for carrying contraband, and concluded that "the rationale underlying these decisions is that

where the car is properly seized by the police pursuant to a forfeiture statute, they [the government] have a greater possessory interest in the car than the owner." *Zaicek, supra,* 519 F.2d at 414.

7. While technically the car was impounded by the city police and remained at the city station house, the evidence clearly demonstrates that the car was seized by the city police at the

Accordingly, we conclude that the thirty-three counterfeit bills were lawfully seized and properly admitted into evidence.

## II. *Chain of Custody Contentions*

Harris also contends that four of the counterfeit $100 bills introduced into evidence over his objection were erroneously admitted, since no chain of custody was proven to show that these bills were the ones attributed to Harris and passed or possessed by him as charged by the specific counts in question.

Without detailed discussion, we find no merit to the contention with regard to the three counterfeit bills introduced to prove guilt of Count III (passing two counterfeit bills to the General Nutrition Center on November 16) and Count V (transferring and delivering three counterfeit bills to Georgia Pierre on November 16—two of which were subsequently passed to the General Nutrition Center). The evidence adequately proves by chain of custody that the bills introduced into evidence at the trial were the counterfeit bills involved in those two offenses.

However, a much more substantial issue is presented with regard to the counterfeit $100 bill introduced into evidence, over Harris' objection, to prove his guilt of Count II—passing a counterfeit bill at the Swiss Colony Store on November 8, a week earlier. The store clerk, who had accepted the bill as genuine, testified that upon examination of it by her store manager, and his assertion it was not genuine, she found the bill was counterfeit. The evidence is devoid of what happened to this bill thereafter, and the government concedes that no chain of custody is proven. The evidence also shows that Harris had twenty genuine $100 bills in his vehicle.

The physical evidence of this particular counterfeit bill introduced to prove guilt of Count II, concededly improperly omitted, furnished strong corroboration of the other-wise somewhat speculative testimony of the store clerk that the bill she had accepted was counterfeit. Harris' argument is substantial that the improper admission of this bill could not be harmless error insofar as his conviction of Count II.

■ However, the sentence on Count II is concurrent with that on Counts I, III, and IV. We have determined that the interests of justice will adequately be served if we vacate the sentence on Count II, under this court's application of the concurrent sentence doctrine. "[I]f a prisoner is serving two or more concurrent sentences, and a reviewing court determines that one of the sentences is valid, the court may decline to review or consider the remaining sentence(s)." *Williams v. Maggio,* 714 F.2d 554, 555 (5th Cir.1983).

In *United States v. Cardona,* 650 F.2d 54 (5th Cir.1981), we found that the concurrent sentence doctrine may be utilized to avoid unnecessary review of a concurrent count, in proper circumstances, by vacating a judgment and conviction that provides for a concurrent sentence (but not the jury verdict of guilt itself)— " 'equivalent in practical effect to a suspension of the sentence. If it later develops that the interest of justice so requires, the sentence can be reimposed on a concurrent basis. The conviction could then be subject to appellate review.' " 650 F.2d at 58. We quoted with approval that such a vacation of justice " 'does not impair any need of the government, avoids the possibility of adverse collateral consequences to defendant, and furthers the general interest of the administration of justice.' " *Id.*

In accordance with these principles, we vacate the conviction of Harris on Count II.

## III. *Sentencing*

■ Harris claims that because he is indigent, the imposition of a five year prison term and a $10,000 fine on Count I, with the additional requirement that Harris

---

direction of two secret service agents (pursuant to their statutory authority), whom the city police had telephoned in New Orleans before seizing the car. Secret Service agent Robinson testified that it was common practice for federal agents to work in conjunction with city police in this manner in counterfeiting arrests and seizures.

stand "committed" until the fine is paid, deprives him of equal protection guaranteed by the Constitution. This same issue was squarely addressed by the Ninth Circuit in *United States v. Estrada de Castillo,* 549 F.2d 583 (9th Cir.1977). Estrada was sentenced to two years imprisonment and a $1500.00 "committed fine."

The *Estrada* court recognized that any sentence that would result in a longer confinement for an indigent than for a person who has the ability to pay would be unconstitutional. *Id.,* 549 F.2d at 584–85, *citing Tate v. Short,* 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971). However, the court relied on the joint policy statement of the Bureau of Prisons and the Board of Parole, which provides a procedure whereby, at a time prior to the date for parole consideration, a prisoner may make his indigent status known. If he is then found to be indigent, he is released at the time the parole is granted. *Estrada supra,* 549 F.2d at 584–85; *see* 28 C.F.R. § 2.7. The *Estrada* court then upheld the sentence, finding that "the possibility of a future illegal action on the part of prison authorities does not make a sentence illegal." *Id.* at 585.

The Eighth Circuit has taken the same position as the Ninth Circuit. In *United States v. Mack,* 655 F.2d 843, 847 (8th Cir. 1981), the court declined to pass upon the constitutionality of the defendant's sentence (a $5,000 committed fine). Instead, the court, assuming that administrative policies would preclude an unconstitutional extension of any prison term, upheld the committed fine. 655 F.2d at 847.

The Supreme Court has made it abundantly clear that "the Constitution prohibits the state from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent." *Tate v. Short, supra,* 401 U.S. at 398, 91 S.Ct. at 671. However, the defendant here was not imprisoned because he was unable to pay a fine, nor is there any reason to believe that administrative policies will not be adhered to when Harris is eligible for parole. We, therefore, adopt the reasoning of the Eighth and Ninth Circuits and

decline to reach the constitutional issue presented us by Harris.

*Conclusion*

For the reasons assigned, therefore, we VACATE the conviction on Court II, and we AFFIRM the convictions on the other four counts.

VACATED AS TO ONE COUNT; AFFIRMED AS TO ALL OTHERS.