UNITED STATES of America,
Plaintiff-Appellee,

v.

Roberto GOMEZ–ROJAS, and Michael
Rece Sutherlin, Defendants-
Appellants.

No. 74–1914.

United States Court of Appeals,
Fifth Circuit.

Feb. 10, 1975.
Rehearing Denied March 26, 1975.

Clarence D. Moyers, Gus Rallis, El Paso, Tex., for Sutherlin and Rojas.

William S. Sessions, U. S. Atty., San Antonio, Tex., Ronald F. Ederer, Asst. U. S. Atty., El Paso, Tex., for plaintiff-appellee.

Before THORNBERRY, GOLDBERG and GODBOLD, Circuit Judges.

GOLDBERG, Circuit Judge:

Appellants Sutherlin and Gomez-Rojas were each convicted by a jury on March 13, 1974, of conspiracy to possess 300 pounds of marihuana with intent to distribute that substance, and of knowingly and intentionally possessing that same marihuana with intent to distribute it, in violation of 21 U.S.C. §§ 846 and 841(a)(1). Although the trial court originally sentenced each appellant to two consecutive five-year terms in prison, with five years special parole, the sentences were later modified to require Sutherlin and Gomez-Rojas to serve the two five-year terms concurrently, with five more years of special parole. Sutherlin and Gomez-Rojas complain of various errors in their joint trial. After a careful study of the record, we conclude that Sutherlin's conviction must be reversed, but that the jury's verdict must stand as to Gomez-Rojas.

On the morning of November 12, 1973, Special Agent DeHoyos of the Drug Enforcement Administration received a telephone call from a confidential informant, advising DeHoyos that certain individuals at an El Paso, Texas, bar desired to sell a quantity of marihuana for $22,500. At DeHoyos' request, one George Smith arranged a meeting on the afternoon of the 12th at a local motel room between DeHoyos, who was posing as a prospective buyer, and Sutherlin, the purported purveyor of contraband. When DeHoyos balked at the price Sutherlin demanded for the marihuana, Sutherlin rejoined that he had no control over the price: "I just set up deals for my man and he takes care of the prices and delivers it." At this point, DeHoyos and Sutherlin adjourned to Smith's automobile, where DeHoyos showed Sutherlin the color of his money; the pair then walked over to Sutherlin's truck, from which Sutherlin removed a kilo of marihuana which he claimed was identical in quality to that which he was offering for sale. Sutherlin and the federal agent then proceeded to a public phone, where Sutherlin made a call to an unknown party, hung up quickly, as "his man could not talk then" and would call back, and shortly thereafter answered a call from an unknown party at the same phone. Sutherlin then advised DeHoyos that the deal could go through, but that there were certain procedural difficulties to be resolved first. At that point Sutherlin left, after arranging to meet DeHoyos later that evening at a neighborhood restaurant.

When the appointed time came, Sutherlin and DeHoyos shared coffee and idle conversation until they noticed Gomez-Rojas drive into the restaurant parking lot. Sutherlin remarked, "that is my man," went out to talk to Gomez-Rojas for several minutes and returned to tell DeHoyos to have George Smith rent a car for the purpose of transporting the marihuana. When Smith arrived with the rental car, Sutherlin told DeHoyos that his supplier would take the car to a warehouse, load it with the marihuana and deliver the vehicle to a prearranged location. Gomez-Rojas, who had left in the interim, returned to the restaurant parking lot and had another private conversation with Sutherlin. Acting on instructions from Sutherlin, DeHoyos drove the rental car to a parking lot adjacent to the Rudolph Chevrolet dealership; Sutherlin then dropped off DeHoyos and Smith at a motel to await developments.

Soon thereafter, Gomez-Rojas drove into the lot where DeHoyos' rental car was parked, left his automobile and drove the rental car next door to Rudolph Chevrolet, where another, unidentified individual in a Cadillac traded vehicles with Gomez-Rojas and drove the rented car to an undiscovered location, evading a number of federal agents along the way. Sutherlin and DeHoyos met again an hour later and drove in separate vehicles to the parking lot of a motel, where the rental car was discovered, its trunk loaded with 300 pounds of marihuana. Sutherlin was arrested on the spot and Gomez-Rojas was arrested while in his parked car 100 feet away in the same parking lot.

At trial, Sutherlin took the stand and admitted most of the comings and goings related above; he contended, however, that George Smith was the villain of the piece and that he, Sutherlin, was entrapped. Smith, according to Sutherlin, was a friend who took advantage of Sutherlin's unhappy financial situation to induce an otherwise innocent citizen to aid him in an illicit business transaction with DeHoyos, whom Smith represented as a marihuana dealer from Albuquerque. Sutherlin alleged that Smith is a paid informer and a Government agent, and that Smith was the source of the marihuana which was found in the trunk of the rental car, so that we are faced with the sordid spectacle of the Government selling marihuana to itself. Sutherlin also claimed that Gomez-Rojas was an innocent bystander who happened to appear in the wrong place at the wrong time. Gomez-Rojas, who works as a salesman at Rudolph Chevrolet, agreed with Sutherlin's account and, unlike Sutherlin, denied any knowledge of the marihuana transaction.

## I. *Sutherlin*

### A.

Sutherlin's sole defense was entrapment, and his intention to demonstrate the truth of this theory at trial was well-known to the district judge before the trial began. In order to establish his defense, Sutherlin subpoenaed George Smith to testify as his witness on the subject of entrapment. On the day the trial began, however, Smith apprised the trial judge, out of the presence of the jury and before any testimony was heard, of his intention to assert his Fifth Amendment right against self-incrimination if called as a witness.[1] In spite of Sutherlin's protests, the district court excused Smith without the slightest inquiry into the legitimacy or the scope of his proposed refusal to testify. Furthermore, the court forbade Sutherlin to place Smith on the stand for the purpose of eliciting a recitation of his name, his address and the Fifth Amendment to the United States Constitution. Thus, at a stroke, Sutherlin was denied the opportunity to examine the individual who, save himself, could testify most thoroughly about the alleged entrapment. Sutherlin argues that this was error. Sutherlin's complaint involves a complex interplay between the law of entrapment, the informer's privilege and Smith's Fifth Amendment right against self-incrimination. We will discuss each factor of the triad in turn.

The United States Supreme Court first recognized and applied the entrapment defense in Sorrells v. United States, 1932, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413. In *Sorrells,* Chief Justice Hughes ruled for the Court that as a matter of statutory construction, the entrapment defense prohibits Government officials from instigating a criminal act by persons "otherwise innocent in order to lure them to its commission and to punish them," 287 U.S. at 448, 53 S.Ct. at 215, 77 L.Ed. at 413, reasoning that Congress passes criminal statutes to deter crime rather than to encourage it. In 1958, in Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848, and again in 1973, in United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36

---

1. It is perhaps worthy of note that Smith repeated this performance one week later in connection with the case of United States v.

Waddell, 5 Cir. 1975, 507 F.2d 1226, also decided today.

L.Ed.2d 366,[2] the Court reaffirmed the principle set out in *Sorrells*: that "[e]ntrapment occurs only when the criminal conduct was 'the product of the *creative* activity' of law-enforcement officials." Sherman v. United States, *supra*, 356 U.S. at 372, 78 S.Ct. at 821, 2 L.Ed.2d at 851. Thus, the entrapment defense turns on the intent or predisposition of the defendant to commit the crime. In 1971, in United States v. Bueno, 5 Cir. 1971, 447 F.2d 903, this Court ruled that the *Sorrells* notion of entrapment must apply as a matter of law where a defendant is charged with dealing in contraband where the contraband in question was supplied to and purchased from the defendant by Government officers or paid informers.[3] If the supplier is a paid informer, the defense is available even if the informer entrapped the defendant on his own initiative, and regardless of whether any Government officer knows the source of the contraband. United States v. Bueno, *supra*. *See* United States v. Mosley, 5 Cir. 1974, 496 F.2d 1012 *and* United States v. Oquendo, 5 Cir. 1974, 490 F.2d 161.

■ Once the defendant presents a prima facie case of entrapment indicating that Government conduct created "a substantial risk that the offense would be committed by a person other than one ready to commit it," Pierce v. United States, 5 Cir. 1969, 414 F.2d 163, 168, the burden shifts to the Government to prove beyond a reasonable doubt that the accused was predisposed to commit the crime charged against him. United States v. Mosley, *supra*. Correspondingly, if the defendant establishes a prima facie case of a transaction of the *Bueno* variety, then the Government must prove beyond a reasonable doubt that the objective facts necessary to a *Bueno* defense did not occur. Once the Government comes forward with evidence that the defendant was not entrapped, then the case may go to the jury. United States v. Oquendo, *supra*.

■ In an ordinary entrapment case, the Government will seek to demonstrate the defendant's predisposition by pointing to the defendant's conduct and to his reputation for dealing in contraband. *See* United States v. Russell, *supra*. In a *Bueno*-type case, however, the Government's task is more difficult. It may not rely solely on the jury's decision to believe or not to believe the defendant's story. United States v. Bueno, *supra*, 447 F.2d at 906. Since in many cases of this type, of which *Bueno* itself was one, the only witnesses to the alleged entrapment are the defendant and the Government agent or informer, the Government must call the alleged supplier, its officer or its informer, as a witness. If the purported supplier is unavailable, however, as in our recent case of United States v. Soto, 5 Cir. 1974, 504 F.2d 557, where the informer had died in the interim, the Government may defeat the defense of entrapment by otherwise demonstrating that the contraband came from a non-Government-related source.

From this discussion of the law of entrapment, it is readily apparent that many such cases involve informers. This circumstance creates additional legal difficulties, for such individuals are not readily available as witnesses. The Supreme Court set out the law of informer's privilege in Roviaro v. United States, 1957, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639:

What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law. . . . The purpose of the privilege is the further-

---

**2.** In *Russell,* the Court stressed that the entrapment defense was of a statutory nature and not a constitutional one.

**3.** In United States v. Oquendo, 5 Cir. 1974, 490 F.2d 161, we determined that there was nothing in United States v. Russell, *supra,* which undermined the validity of the *Bueno* rationale.

ance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.

The scope of the privilege is limited by its underlying purpose. Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged. Likewise, once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable.

A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action. . . .

We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors. 353 U.S. at 59–62, 77 S.Ct. at 627, 1 L.Ed.2d at 644–646.

 Where a defendant charges that a paid Government informer has entrapped him, *Roviaro* ordinarily demands disclosure of the informer's identity, since the defendant's entire defense rests upon allegations which the informer is in a unique position to affirm or deny. *See*

United States v. Bueno, *supra*, and United States v. Oquendo, *supra*; *see also* Branzburg v. Hayes, 1972, 408 U.S. 665, 698, 92 S.Ct. 2646, 33 L.Ed.2d 626, 649. This requirement involves a legal fiction, in that a defendant who claims entrapment cannot . help but admit that he knows the identity of the informer. The exclusionary scope of the informer's privilege, however, is so broad as to cripple the defendant's defense unless the defendant goes through the motions of requiring disclosure, so that he may call the informer as a witness, compel the Government to call him or ask other witnesses questions about the informer. In this case, Sutherlin knows very well who the alleged informer Smith is, and he knew before the trial where Smith could be reached by process, for Smith was served with a subpoena to appear as Sutherlin's witness. It was then that Smith, apparently on his own motion, informed the trial judge that he would refuse to testify if called, and the district court accepted his claim of Fifth Amendment privilege without more and excused him from testifying.

The Fifth Amendment to the United States Constitution declares in part that "No person . . . shall be compelled in any criminal case to be a witness against himself." In Hoffman v. United States, 1951, 341 U.S. 479, 486–487, 71 S.Ct. 814, 818, 95 L.Ed. 1118, 1124, the Supreme Court enunciated the standard for measuring when a witness may properly claim his right. against self-incrimination, and thus refuse to respond to questioning:

> To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it was asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. . . . .

 The *Hoffman* Court also indicated, however, that a simple blanket declaration by the witness that he cannot testify for fear of self-incrimination will not suffice to invoke the privilege,

*see* United States v. Malnik, 5 Cir. 1974, 489 F.2d 682; the mechanism of the Fifth Amendment is not automatic or self-winding. Accordingly, the custom is for the trial judge to examine the protesting witness out of the presence of the jury in order to determine the validity of his claim. Once the court satisfies itself that the claim is well-grounded as to the testimony desired, it may, in its discretion, decline to permit either party to place the witness on the stand for the purpose of eliciting a claim of privilege or to comment on this circumstance. United States v. Lacouture, 5 Cir. 1974, 495 F.2d 1237, cert. denied, —— U.S. ——, 95 S.Ct. 631, 42 L.Ed.2d 648.

■ In this case, the Government cannot be penalized, either under the Compulsory Process Clause of the Sixth Amendment or the law of entrapment, because Smith chose to exercise his Fifth Amendment rights, thus making himself as unavailable for purposes of testimony as the deceased informant in United States v. Soto, *supra*. *See* United States v. Tatum, 5 Cir. 1974, 496 F.2d 1282. That is not to say, however, that Smith's claim of privilege was well-founded.

■ In United States v. Lacouture, *supra*, the district court held an extensive hearing out of the presence of the jury in order to establish the fact that the witness could legitimately refuse to answer essentially all relevant questions that could be put to her. Here, on the other hand, we have only Smith's bald assurance that he has a proper Fifth Amendment right to refuse to answer any relevant question that Sutherlin could ask of him. In such a situation, especially considering the critical nature of his testimony, we conclude that the district court erred in excusing him as a witness. On remand, the trial court must hold a hearing to determine whether Smith's fear of self-incrimination is well-founded and what the parameters of his Fifth Amendment rights are in the context of the testimony that Sutherlin wishes to obtain from him. If the court finds that Smith cannot properly invoke the Fifth Amendment with re-

spect to any relevant and material questions which Sutherlin purposes to ask him, then Smith must testify at the new trial. If, on the other hand, the court finds that Smith may legitimately refuse to answer essentially all possible relevant questions, then the district court must decide in its informed discretion whether, in light of Sutherlin's entrapment defense, Sutherlin should be allowed to elicit Smith's refusal to testify before the jury or to comment on that refusal.

### B.

Sutherlin also objected at trial and argues now that the trial court improperly instructed the jury when it charged that an entrapment defense was made out only if the Government furnished the marihuana to Sutherlin, either directly or through Smith:

> In order for there to be entrapment . . . you would have to find that the Government had delivered or turned over or made available the marihuana that was going to be delivered, that Mr. Sutherlin was going to sell to the agent. . . . Now if you find from the evidence that the Government entrapped Mr. Sutherlin, that they furnished the means, the marihuana, turned it over to the man Smith, or whoever it is to use to entrap Mr. Sutherlin, then [you would have to decide whether the Government proved beyond a reasonable doubt that Sutherlin was not entrapped].

■ Our previous discussion of the law of entrapment demonstrates that this instruction was indeed erroneous, because entrapment would arise here if Smith had supplied the marihuana to Sutherlin from his own resources and without the actual knowledge of De-Hoyos or any other Government officer. The law does not require that a man be badged in order to be capable of entrapping an innocent citizen. Given the critical relationship of the instruction to Sutherlin's sole defense, and finding no other part of the instructions which remedies that defect, we conclude that Suth-

erlin must have a new trial. In view of our disposition of Sutherlin's appeal, we pretermit discussion of his other claims of error.

## II. *Gomez-Rojas*

Gomez-Rojas does not claim that he was entrapped, but rather argues that he is innocent of any wrongdoing, and that the evidence introduced against him fell far short of that necessary to support the jury's verdict against him. In reviewing the sufficiency of the evidence supporting a criminal conviction, we must sustain the jury verdict if, taking the view most favorable to the Government, there is substantial evidence to support it. Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; United States v. Velasquez, 5 Cir. 1974, 496 F.2d 1009. Although the test for sufficiency is the same whether the evidence is direct or circumstantial, United States v. Moore, 5 Cir. 1974, 505 F.2d 620; United States v. Velasquez, *supra*; United States v. Warner, 5 Cir. 1971, 441 F.2d 821, cert. denied, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58, we must determine not only that the inferences to be drawn from the circumstantial evidence against Gomez-Rojas are consistent with guilt but that a jury could conclude that those inferences are inconsistent with every reasonable hypothesis of innocence. United States v. Fairchild, 5 Cir. 1975, 505 F.2d 1378; United States v. Ferg, 5 Cir. 1974, 504 F.2d 914; *see* United States v. Squella-Avendano, 5 Cir. 1973, 478 F.2d 433.

The jury here heard evidence that Sutherlin told DeHoyos at their first meeting that he, Sutherlin, was only a middleman in this transaction, that "my man . . . takes care of the prices and delivers [the marihuana]." DeHoyos testified that while he and Sutherlin were seated in the restaurant, Gomez-Rojas drove into the restaurant parking lot, at which time Sutherlin stated "that is my man" and went out to talk to Gomez-Rojas. After this conversation, Sutherlin instructed DeHoyos to rent a car for the purpose of transporting the marihuana which was the object of their negotiations. There was also testimony that immediately after Smith brought the newly-rented automobile into the restaurant parking lot, Gomez-Rojas returned and had another private conversation with Sutherlin. Federal agents testified that after DeHoyos had driven the rental car to a parking lot next to Rudolph Chevrolet, Gomez-Rojas drove into the same lot, parked his car next to the rental car and entered that car. Almost immediately thereafter, a person dressed similarly to Gomez-Rojas was observed leaving the rental car in the Rudolph Chevrolet lot and exchanging vehicles there with an unidentified individual who drove the rental car to an undiscovered location.[4] Finally, at the time Sutherlin was arrested in the motel parking lot while in the process of exchanging the marihuana for DeHoyos' cash, Gomez-Rojas was apprehended while sitting in his own automobile 100 feet away in the same parking lot.

Gomez-Rojas and Sutherlin agree on the former individual's true role in the piece and each defendant took the stand to give a reasonably coherent explanation of Gomez-Rojas' unfortunate ubiquity on the night of November 12, 1973. Very generally, defendants contend that they had been friends for some time on the night in question, so that when Sutherlin saw Gomez-Rojas enter the restaurant parking lot, he rushed out to warn the latter away, lest Gomez-Rojas make some amiable remark upon finding Sutherlin in the restaurant and thereby reveal to DeHoyos the identity that Sutherlin claims he had not yet divulged. Gomez-Rojas contends that his activities in the Rudolph Chevrolet lot are easily

---

4. There was some confusion among the several agents who testified about the events in and near the Rudolph Chevrolet lot as to whether the car that Gomez-Rojas drove into the lot was a light brown or beige Ford or a gold Chevrolet (it was the former). We do not believe that such confusion, especially at night, is significant.

explained by the fact that he is a salesman at that establishment and frequently has to move several cars about on the lot prior to closing for the night; he necessarily adds that the federal agents are mistaken in their contention that one of the autos he moved that night was the rental vehicle used in the marihuana transaction. Finally, Sutherlin and Gomez-Rojas agree that the former had asked the latter for a ride home from the motel that night, not because Sutherlin actually needed such a ride (he had his own vehicle on hand), but because Sutherlin wanted a friend around when dealing with DeHoyos late at night in a deserted motel parking lot.

■ Sutherlin and Gomez-Rojas presented the jury with a plausible explanation of Gomez-Rojas' behavior, an explanation which differs in only a few particulars from what Government witnesses testified that they saw on that night. Be that as it may, the jury rejected the defendants' story and convicted Gomez-Rojas of the offenses charged against him. Although this is a close case, we cannot say that there is insufficient evidence to support the verdict. A comparison of this case with our decision in United States v. Arroyave, 5 Cir. 1973, 477 F.2d 157, will demonstrate why this verdict must stand.

The defendant in *Arroyave* was charged with conspiracy to import and possess marihuana and with possession of marihuana with intent to distribute. The evidence there showed that Arroyave was a friend of a co-defendant, Posada, that Posada's truck was seen near Arroyave's home on several occasions and that on the day when a plane carrying the marihuana upon which the charges were based landed in the United States and the marihuana delivered to Posada, Arroyave was observed near the aircraft and spoke to Posada at that time. We found that the evidence against Arroyave amounted at most to guilt by association and that the Government's circumstantial evidence was insufficient to exclude the possibility that Arroyave knew nothing about the contraband transaction.

Much of the evidence against Gomez-Rojas tends only to establish his guilt by association with Sutherlin, who had admitted his part in the transaction. The evidence which differentiates this case from *Arroyave* is the testimony by several surveilling federal agents which tends to show that Gomez-Rojas moved the rental automobile from the place where DeHoyos had left it to the Rudolph Chevrolet lot, where another individual drove it into the night, to be loaded with marihuana by unknown hands at an unknown place. Considered in conjunction with the other circumstantial evidence against Gomez-Rojas, this action was sufficient to support an inference by the jury that Gomez-Rojas was a knowledgeable and active member of the conspiracy, and not just an innocent bystander. *See* United States v. Prieto, 5 Cir. 1974, 505 F.2d 8 *and* United States v. Sidan-Azzam, 5 Cir. 1972, 457 F.2d 1309. Once the jury made such a finding, it could consider Sutherlin's alleged statements that "his man" was supplier and that Gomez-Rojas was "his man." *See* United States v. Tyler, 5 Cir. 1975, 505 F.2d 1329. The jury could have found that this combination of Gomez-Rojas' actions and Sutherlin's statements was inconsistent with every reasonable hypothesis of Gomez-Rojas' innocence. There was thus sufficient evidence to sustain Gomez-Rojas' conviction on the conspiracy charge.

■ Since constructive as well as actual possession of contraband will sustain a conviction under 21 U.S.C. § 841(a), United States v. Ferg, 5 Cir. 1974, 504 F.2d 914, and since the dominion and control over the contraband necessary to constitute such possession can be proven by circumstantial evidence, United States v. Richardson, 5 Cir. 1974, 504 F.2d 357, we believe that the evidence here was sufficient to support the jury's verdict that Gomez-Rojas indeed possessed the marihuana with intent to distribute it.

■ Gomez-Rojas also contends that the trial court erred in failing to declare a mistrial on two occasions when ques-

tions by defense counsel to two federal agents elicited responses indicating that Gomez-Rojas had previously been involved in drug transactions. There is no merit in this argument. Each answer was in fair response to counsel's inquiry about why it was that the surveilling agents recognized Gomez-Rojas. There is no allegation or evidence of Government impropriety in the matter. *See* United States v. McKinley, 5 Cir. 1974, 493 F.2d 547.

■■■ Gomez-Rojas claims that the district court should not have admitted De-Hoyos' testimony that Sutherlin stated "[t]hat is my man" when Gomez-Rojas drove into the restaurant parking lot for the first time. The Government rejoins that this statement was admissible against Gomez-Rojas, as it falls within the co-conspirator exception to the hearsay rule. This exception admits hearsay statements made by one conspirator about another, if the statement was made in the course of and in furtherance of the conspiracy. Krulewitch v. United States, 1949, 336 U.S. 440, 69 S.Ct. 716, 93 S.Ct. 716, 93 L.Ed. 790; United States v. Register, 5 Cir. 1974, 496 F.2d 1072. In order to set the predicate for the admission of such testimony, however, the Government must first establish, through independent evidence, a prima facie case of conspiracy with respect to the defendant against whom it is to be admitted. Until that time, the evidence is admissible only against the declarant; once the jury finds that such a foundation has been laid, however, it may consider the hearsay testimony for whatever else it may show. United States v. Tyler, *supra*; United States v. Apollo, 5 Cir. 1973, 476 F.2d 156; *see* Lutwak v. United States, 1953, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593.

■■■ The trial court here gave a full and accurate cautionary charge to the jury at the time Sutherlin's statement was offered and the court repeated the charge at the conclusion of the trial. The value of such a charge in these circumstances is highly questionable, especially where, as here, the evidence against the defendant against whom it is offered is completely circumstantial. Furthermore, it is difficult to see what possible value the statement could have if it is not admissible for the purpose of inculpating Gomez-Rojas in the conspiracy. However that may be, the case law clearly compels the conclusion that the statement was properly admitted.

■■■ Gomez-Rojas next argues that the trial court's instructions to the jury constituted a directed verdict of guilty. In reviewing a trial judge's instructions, we must evaluate the charge as a whole, without isolating statements which may appear prejudicial outside the context in which they were made. United States v. Cisneros, 5 Cir. 1974, 491 F.2d 1068; United States v. Williams, 5 Cir. 1973, 473 F.2d 507; United States v. Jacquillon, 5 Cir. 1972, 469 F.2d 380. Judged by this standard, although the district court at times appears to have been less than even-handed in its recitation of the evidence, its charge, taken as a whole, was complete and accurate, with the exception already noted with respect to entrapment, about which Gomez-Rojas may not complain.

■■■ Finally, Gomez-Rojas charges that the trial was so interspersed with judicial interference with the presentation of his case, and so replete with comments from the bench unfavorable to him that he was denied a fair trial. In considering this very serious charge, we must look to the record as a whole, United States v. Hill, 5 Cir. 1974, 496 F.2d 201; United States v. Ramsey, 5 Cir. 1974, 493 F.2d 457, noting that the district judge, as governor of the trial process, may take measures to ensure that the trial progresses smoothly, and may comment on the evidence, so long as he is careful to instruct the jury that they are the sole judges of the facts. United States v. Cisneros, *supra*; United States v. Jacquillon, *supra*. We will affirm a conviction on the basis of a record disclosing significant judicial participation, however, only when we are convinced that the intervention could not reasonably have led the jury to a predisposition

of guilt by improperly confusing the functions of judge and prosecutor. United States v. Hill, *supra; see generally* Quercia v. United States, 1933, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321. Although the trial judge here sometimes seemed less than convinced by some of defendant's evidence, and at other times displayed considerable impatience with Gomez-Rojas' presentation of his case, we do not find the sort of judicial advocacy of the Government's position which would have denied Gomez-Rojas a fair trial.

In summary, Sutherlin's conviction is reversed; he is entitled to a new trial because of an erroneous jury instruction. If, at a second trial of Sutherlin, Smith again declines to testify, the district court must be careful to ascertain whether and to what extent his claim of right is well-founded, and what effect this finding should have on Sutherlin's presentation of his entrapment defense to the jury. Gomez-Rojas, on the other hand, had a trial free from reversible error. Although the circumstantial evidence against him is far from overwhelming, it is sufficient to sustain the jury verdict; Gomez-Rojas' conviction is affirmed.

Affirmed in part; reversed in part and remanded.