*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-CF-1104

ONTIONE B. JONES, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2015-CF2-010102)

(Hon. Maribeth Raffinan, Trial Judge)
(Hon. Juliet J. McKenna, Motion Judge)

(Argued March 27, 2018                    Decided June 20, 2024)

*Richard S. Stolker* for appellant.

*Sharon A. Sprague*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, and *Eric Hansford*, Assistant United States Attorneys, were on the brief, for appellee.

Before MCLEESE, *Associate Judge*, and RUIZ and THOMPSON,[*] *Senior Judges*.

Opinion of the Court by *Senior Judge* RUIZ.

Opinion by *Associate Judge* MCLEESE, concurring in part and concurring in

---

[*] Judge Thompson was an Associate Judge of the court at the time of oral argument. She began her service as a Senior Judge on February 18, 2022.

the judgment, at page 30.

RUIZ, *Senior Judge*: Following a jury trial, appellant, Ontione Jones, was convicted of various offenses for possession of a firearm. Appellant did not dispute he had the gun but claimed he was set up by a government informant. On appeal, he assigns error to the trial court's failure to conduct further inquiry and to require the government to disclose the identity of the confidential informant to assist with his entrapment defense under *Roviaro v. United States*, 353 U.S. 53 (1957). We conclude that the trial court's denial of appellant's motion to disclose the informant was legally flawed; therefore, we reverse and remand for further proceedings.[1]

## I. Procedural & Factual History.

## A. Pretrial Disclosure Proceedings.

Before trial, appellant moved to order the government to disclose the identities of all confidential informants involved in his case "regardless of whether they will testify at trial" because the "materials generated to date" showed that "information used by law enforcement . . . was derived from confidential informants." The

---

[1] In light of our decision to reverse and remand the case on this basis, we need not consider appellant's additional contentions that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose the informant and that the trial court erred in denying appellant's motion for a new trial (newly discovered evidence) as time-barred.

motion proffered that "[w]itnesses . . . provided information . . . after they were either charged or told that they would be indicted" and their identities were "necessary [for] the defense . . . to investigate bias, motives to fabricate[,] and to cast doubt upon the credibility of certain witnesses" to, or participants in, the charged crimes.

The government did not deny the use of an informant but opposed disclosure of the informant's identity. It proffered that a Metropolitan Police Department ("MPD") officer received "information from a confidential source about an individual in possession of a firearm" who was "driving a white Cadillac with license plate number EW8719." According to the government, forty-five minutes later, officers "found [appellant] sitting in the driver's seat"—the "sole occupant" of that car—and recovered a loaded handgun from his waistband. The government argued that "the possession charges here stem from the moment that the police found the gun on [appellant's] body" and that appellant "proffered no reason to think that the [confidential] source was present at the moment when the police found the gun . . . after the source passed the tip to [MPD]."

At a hearing on the motion, Superior Court Judge Juliet McKenna asked if "there [was] anything that [defense counsel] wanted to add to" the motion for disclosure of the informant's identity. Defense counsel made an ex parte proffer that

the defense would be entrapment—that the confidential informant offered appellant $150 to give the informant a ride, and told him to "make sure you bring the gun because we need that." Judge McKenna recognized that if appellant was entrapped by a confidential informant "working as an agent of [MPD,] then it might become necessary" to disclose the informant's identity, so she delayed ruling on the motion to give defense counsel a week to provide additional evidence—text messages purportedly supporting appellant's assertions.

At a subsequent hearing, Judge McKenna had another ex parte exchange with defense counsel because she had not received the additional proffer concerning text messages she understood would reflect "that [the suspected confidential informant] was offering to pay [appellant]." She further indicated that defense counsel had not proffered anything establishing that the confidential informant "was acting at the direction of [MPD]." Defense counsel responded that "[i]f the [confidential informant] is asking [appellant] to bring a gun . . . that is the government." Judge McKenna stated that "[s]imply encouraging someone to engage in criminal activity . . . does not give rise to an entrapment defense" and "the defense would also have to be able to prove that" appellant was not "predisposed to engage in that criminal activity." Defense counsel responded that the confidential informant offered appellant "$150 to come out. And that's when" appellant "came out and [brought] the gun." Judge McKenna denied the motion "because there's been

absolutely no evidence here that the [informant], in encouraging [appellant] to come out of the house or offering him money, was acting at the direction of the Metropolitan Police Department."

In open court, Judge McKenna stated that defense counsel could "cross-examine the officer about his relationship with the confidential informant and what the communication was between the officer and [the confidential informant] prior to [appellant's] arrest," adding that, "even if the [confidential informant] was actively encouraging" appellant to exit "his home with a weapon, the case law is clear that inducement is not incurred merely by someone offering a person the opportunity to engage in criminal activity." "[I]n the absence of any further factual proffer or anything that would support the fact that the [confidential informant] was acting under the direction of [MPD] to entrap[]" appellant, Judge McKenna repeated, she was denying the motion on that basis. The government asked the judge to clarify whether she found any "basis to believe that the confidential informant was a witness." Recognizing that, "at bottom, cases in which . . . the identity of the [confidential informant] should be disclosed are cases where the [confidential informant] has been either a direct participa[nt] or a witness to the crime," Judge McKenna indicated that it was her understanding, and the prosecution concurred, "that the [confidential informant] was [not] on the scene at the time that the officers approached" appellant.

Judge McKenna deferred ruling on appellant's request for an entrapment jury instruction until she knew "how the evidence comes out" at trial. The case was then transferred to Superior Court Judge Maribeth Raffinan for a suppression hearing and trial.

## B. Pre-Trial Suppression Hearing.

In a second hearing on the same day, the government informed Judge Raffinan that it had learned that an entrapment defense might be raised "for the first time [that] morning" and asked that the defense be excluded from raising this theory in its opening statement because Judge McKenna had not found sufficient facts to rule on an entrapment instruction. The government indicated its opposition to an entrapment instruction "absent some sort of further proffer and determination by the [c]ourt that . . . there is actually a potential entrapment defense."

Defense counsel made additional ex parte representations to Judge Raffinan that the informant called appellant several times and offered him money to "come out to meet him," then "left the gun in the car" with appellant who "put it in his waist because he was . . . scared," seconds before the police arrived on the scene. Judge

Raffinan asked if this was the proffer "made to Judge McKenna."[2] Defense counsel relayed Judge McKenna's prior decision that appellant would not "get an informant disclosure on that ground[]" and that a decision would be made on an entrapment instruction after the evidence was presented at trial.

The court proceeded to the hearing on appellant's motion to suppress the handgun and appellant's statement admitting to having the gun made to MPD when he was first approached. After hearing from Sergeant Curt Sloan, the officer who received the informant's tip in this case and recounted the MPD's experience with the informant, the trial court found that the tip was sufficiently reliable to support the investigatory stop and denied the motion to suppress. Judge Raffinan did not clearly rule on whether defense counsel could refer to an entrapment defense in his opening statement (and the government did not request a ruling).

## C. Trial.

Defense counsel opened by explaining to the jury that "an informant, a

---

[2] Defense counsel's two proffers were not identical: counsel had proffered to Judge McKenna that the informant asked appellant to bring a weapon when he gave him a ride; counsel proffered to Judge Raffinan that the informant had brought a weapon and left it in appellant's car when he exited the vehicle, purportedly to pick up his belongings on the way to their final destination. This difference in the proffers is irrelevant to our analysis of the error underlying the trial court's denial of the request for disclosure of the informant's identity.

snitch," called appellant and offered to pay him for a ride and asked appellant to bring a gun. Defense counsel stated that "we know . . . the informant entrapped him . . . [b]ecause Sgt. Sloan will testify that this particular informant called him, gave him information." He concluded that "[n]ot only did the snitch set him up, he got paid. He got $500."

Beginning the government's case, the prosecution called the MPD Gun Recovery Unit officer who initially approached the Cadillac and the officer who identified the gun in appellant's waistband. The officers found appellant sitting in the driver's seat, alone in the car, and asked if he had a gun. Appellant promptly acknowledged that he did and cooperated as he was arrested. The officers recovered a gun with twelve rounds of ammunition from the right side of appellant's waistband. There were four usable fingerprints found on the magazine; only one was identified as being appellant's. On cross-examination of the officers, defense counsel elicited that MPD had received information from a paid confidential informant that led them to appellant and probed the officers' familiarity with the informant. Defense counsel also asked how the officers knew the Cadillac would be in the area, how long it took them to find the car (they did not recall), and whether the gun's serial number was traced (apparently not). The officer who first approached appellant had "no idea if the informant was ever in the car."

The defense called Sgt. Sloan, the officer who received the tip from the informant that was passed on to the arresting officers. Sgt. Sloan testified that at approximately 4:00 p.m., a confidential informant provided a tip about an individual in possession of a firearm. The informant told Sgt. Sloan that MPD might find a gun in a bag under a seat or in the trunk of a white Cadillac and gave the license plate number of the vehicle.[3] This informant had been paid by MPD on six prior occasions over a two-year period for information that led to gun arrests. Sgt. Sloan testified that he paid the informant $500 for the tip that led to appellant's arrest. He also said that he did not have contact with the informant between the time he received the informant's call and appellant's arrest less than an hour later. He did not know if the informant had placed the gun in appellant's car. During cross-examination, the prosecution elicited that MPD would arrest an informant if they knew the informant planted evidence. On redirect, Sgt. Sloan denied that an informant would be paid only if there was an arrest, making clear an informant might also be paid if the tip led to the recovery of a gun or useful evidence. Defense counsel then pressed Sgt. Sloan to admit that, as he could not say what the informant had done in this case, appellant was the only person who could testify that the informant had set him

---

[3] The arresting officers were asked whether they had seen a bag in the car and they had not, or did not recall.

up.[4]

Appellant took the stand. He testified that at around 3:30 p.m., an acquaintance known to him as "Caine," to whom he had previously given paid rides, called several times saying he was in a bind with his girlfriend and requesting that he give Caine a ride to her house to pick up belongings and then on to his grandmother's house. Appellant declined three times because he was home in Upper Marlboro, Maryland, and tired from having worked that day. On the fourth call, Caine offered to pay him more than $100, and appellant agreed. During that last call, Caine asked if appellant had a gun and appellant said that he did not. Around 4:30 p.m., when appellant arrived in his car to pick Caine up at Potomac Gardens in D.C., Caine was speaking on his phone. Caine again asked appellant if he had a gun, and appellant reiterated that he did not.

Appellant drove Caine five blocks up the street to the Kentucky Courts complex, where Caine got out of the car with his phone and went inside to get his stuff, without paying for his ride. While waiting for Caine, appellant looked down and saw a gun "halfway out of [Caine's] bag." Surprised, angry, and nervous

---

[4] In rebuttal, the government recalled Sgt. Sloan to briefly testify that confidential informants are rarely brought to court because doing so would reduce the number of informants providing information about criminal activity.

because he had an earlier felony conviction, appellant said that he picked up the gun, checked to see if it was loaded, saw that it was, and secured the magazine. He put the gun in his waistband as there were older folks and kids walking about who would be able to see it as they went by the car. "[L]ess than three minutes" after appellant picked up the gun, MPD officers arrived, seized the gun, and arrested appellant.

Without objection from the government, appellant requested and received an entrapment instruction. Judge Raffinan instructed the jury that the defense of entrapment applies "if law enforcement officials, either directly or through an agent such as an informant, induced a person to commit a crime which he would not otherwise have committed." During deliberations, the jury asked "[i]f the jury unanimously agrees that the defendant was entrapped, does that mean he has to be found not guilty of each of the five charges?" The court further instructed that "if the jury unanimously agree[d] that [appellant] was entrapped as to each offense, separately, then [it] must find him not guilty of each offense."

The jury convicted appellant of unlawful possession of a firearm by a convicted felon, possession of an unregistered firearm, and possession of ammunition in violation of D.C. Code §§ 7-2502.01(a), 7-2506.01(a), and 22-4503(a)(1) and (b)(1). He was acquitted of carrying a dangerous weapon and

possessing a large capacity ammunition feeding device under D.C. Code §§ 7-2506.01(b) and 22-4504(a)(2).[5]

### D. Post-Trial Motion for New Trial.

In his motion for a new trial, appellant argued that his rights to interview the informant and present his defense were violated because he was not able to prove that he was entrapped without the informant. In support of the motion, appellant submitted a juror's post-verdict email to Judge Raffinan stating that, "according to the tenets of the law, [entrapment] could not be proven" and the jury "believed [it] had NO LEGAL OPTION but to declare [appellant] guilty" even though "THE MAJORITY . . . felt that [appellant] was not only set up, but put in a position in which he was given no choice to make a decision"; and that the jury might not have reached a verdict if it had understood that to be an option. The government opposed the new trial motion as untimely and meritless.

Judge Raffinan denied the motion for a new trial as untimely and declined to consider the email, further finding that "even if it was . . . to be considered

---

[5] The jury had asked if "knowledge and/or awareness that the weapon contained a large capacity ammunition feeding device" mattered to whether "the defendant possessed the . . . device voluntarily and on purpose." The court responded that such knowledge is required.

substantively" the verdict "should stand for the reasons discussed in" *Sellars v. United States*, 401 A.2d 974 (D.C. 1979) (evidence of jury confusion not grounds for new trial if jurors were properly instructed); as to the confidential informant, Judge Raffinan stood by the determination that was made pretrial by Judge McKenna.

## II. Disclosure of the Informant's Identity.

We review the "trial court's decision on whether to order disclosure" of an informant's identity for the defendant to develop his case "only for abuse of discretion." *Goodson v. United States*, 760 A.2d 551, 553 (D.C. 2000); *accord United States v. Lyons*, 448 A.2d 872, 875 n.6 (D.C. 1982). Thus, we must determine whether the trial court identified the correct legal standards and properly applied them to appellant's request for the informant's identity to investigate and present his defense. *See, e.g.*, *Jones v. United States*, 17 A.3d 628, 631 (D.C. 2011). Whether there is sufficient evidence for a defendant to raise entrapment as an affirmative defense is a question of law that we review de novo. *See Daniels v. United States*, 33 A.3d 324, 327, 329 (D.C. 2011); *Minor v. United States*, 623 A.2d 1182, 1188 (D.C. 1993).[6]

---

[6] In doing so, we consider the trial testimony as well as the pretrial proffers, as the parties do in their briefs.

## A. The Informer's Privilege and Entrapment.

"The informer's privilege, which is in reality the government's privilege, protects the identity of people who inform law enforcement officials of violations of law." *Lyons*, 448 A.2d at 874 (citing *Roviaro*, 353 U.S. at 59). No absolute rule requires disclosure of the informant's identity. *See Sturgess v. United States*, 633 A.2d 56, 58, 60 (D.C. 1993); *Savage v. United States*, 313 A.2d 880, 884 (D.C. 1974). But neither is the government's privilege absolute. A defendant may overcome the privilege by making a non-speculative demonstration "that the informer is not merely an informer but rather a participant, an eyewitness[,] or someone who could give direct testimony on the events at issue." *Lyons*, 448 A.2d at 874; *see also Hamilton v. United States*, 395 A.2d 24, 26 (D.C. 1978). In *Roviaro*, the Court explained that "no fixed rule with respect to disclosure is justifiable." 353 U.S. at 61. Instead, the trial court must appropriately balance "the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* at 62 (quoted in *Lyons*, 448 A.2d at 875). This is a case-specific, fact-intensive inquiry that takes into account "the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* (*cited in Sturgess*, 633 A.2d at 58). The trial court may strike the *Roviaro* balance, short of disclosure, through in camera inquiry, attested questionnaire, or other measure to

explore the relevance of the informant to an asserted defense. *See Sturgess*, 633 A.2d at 58, 62; *Savage*, 313 A.2d at 883-84, 883 n.5. "Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Roviaro*, 353 U.S. at 60-61. If the government refuses the court's order to disclose the informant's identity for use by the defense, the court may dismiss the case. *Id.* at 61.

Entrapment exists where "the police, the Government informant, and the defendant acted in concert with one another" such that "the result of the governmental activity is to implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission." *Hampton v. United States*, 425 U.S. 484, 490 (1976) (internal quotation marks and citation omitted). A jury instruction "on the affirmative defense of entrapment [is warranted] when there is sufficient evidence of government inducement of the crime *and* a lack of predisposition on the part of the defendant to engage in that criminal conduct." *Daniels*, 33 A.3d at 327 (quoting *Minor*, 623 A.2d at 1187); *see Hampton*, 425 U.S. at 489-90.

**B. This Case.**

Entrapment was at the heart of the defense theory. Appellant conceded he had the gun but argued that the government informant who directed Sgt. Sloan to appellant's car and told him there was a gun in the car was the same person appellant knew as Caine, who contacted him insistently several times that day, offered to pay him over $100 if appellant would drive him, and then planted a gun in appellant's car to be found when the police arrived.

Appellant's proffers and trial testimony sufficed to meet his initial burden of making a non-speculative case that disclosure of the confidential informant would be helpful to the defense because it showed that, if Caine was the confidential informant, he was more than just a provider of information, but rather a direct participant, eyewitness, "or someone who could give direct testimony on the events at issue." *Lyons*, 448 A.2d at 874; *see also Hamilton*, 395 A.2d at 26. The suspected informant was a witness who, at a minimum, could testify about the events that led appellant to drive to the place where he was arrested and about how the gun came to be in appellant's car. Here, appellant claimed the informant was much more, an active participant who engineered the crime and pinned it on appellant. According to the defense, the informant was the person who overcame appellant's initial reluctance and offered money as an inducement to drive him that day and the only

person other than appellant who was present in appellant's car minutes before the police arrived to seize the gun and arrest appellant. Sgt. Sloan testified at the suppression hearing that he gave the informant a handsome financial reward for the tip, as had occurred on several occasions in the past two years. Thus, the informant could provide factual details material to the entrapment defense, both about his relationship with law enforcement and his interactions with appellant in the sequence of events that led to appellant's arrest for gun possession.

Appellant's nonspeculative request for disclosure of the informer "require[d] the court to balance the public interest . . . against the individual's right to prepare his defense." *Goodson*, 760 A.2d at 552-53 (quoting *Lyons*, 448 A.2d at 874). However, that balancing did not take place because the trial court's consideration of the disclosure motion was shut down at the outset by an error of law. The trial court stated twice that it was denying appellant's motion for disclosure based on its understanding that, for entrapment to be found, appellant must have been induced to commit a crime by someone acting "at the direction" or "under the direction" of a government officer. As we now discuss, this reasoning was erroneous.

We have not previously decided whether direct instruction or supervision of an informant by the government is required to prove entrapment, but we are

persuaded by federal and state decisions that it is not. [7] *See Sherman v. United States*, 356 U.S. 369, 373-75 (1958) (attributing the conduct of an informant to the government, even though informant was not paid, because he "was an active government informer who had but recently been the instigatory of at least two other prosecutions"; finding that the government did not question the informant's tactics and thus "[t]he Government cannot make such use of an informer and then claim disassociation through ignorance"); *United States v. Barnett*, 197 F.3d 138, 143 (5th Cir. 1999) ("an informer may be an agent of the government even if its officials do not directly orchestrate [the informer's] activities. Law enforcement authorities may not . . . secure insulation from charges of entrapment simply by leaving the informers to their own devices.");[8] *Commonwealth v. Tracey*, 624 N.E.2d 84, 89 n.10 (Mass.

---

[7] Precedent binding on this court is not to the contrary and, to the extent the issue is discussed, tends to support that cooperation, but not necessarily direct instruction, suffices to establish that informant is a government agent for purposes of entrapment. *See Johnson v. United States*, 317 F.2d 127, 128 (D.C. Cir. 1963) ("The entrapment defense does not extend to inducement by a private citizen; yet it has found general application to cases where the officer acts through a private citizen, as in the case at bar[,]" where officer provided official funds and transportation to facilitate drug transaction).

[8] *See United States v. Gomez-Rojas*, 507 F.2d 1213, 1218 (5th Cir. 1975) ("If the supplier is a paid informer, the defense is available even if the informer entrapped the defendant on his own initiative, and regardless of whether any Government officer knows the source of the contraband."); *United States v. Waddell*, 507 F.2d 1226, 1228 (5th Cir. 1975) ("The law is that Smith, if he was a paid Government informer, could entrap Waddell, even though no Government officer knew of Smith's actions, because the Government is deemed to have constructive knowledge

1993) ("[W]e have never required a third party not employed by the government to meet traditional agency requirements. . . . Rather, we have said that the defense of entrapment is raised by evidence of inducement by a government agent *or one acting at his direction*" (citing *Commonwealth v. Brzezinski*, 540 N.E.2d 1325, 1328 (Mass. 1989), for the proposition that an informant's actions may be attributed to the government where promises were made to the informant in exchange for assistance) (emphasis in original)); *State v. Shropshire*, 874 S.W.2d 634, 638-39 (Tenn. Crim. App. 1993) (finding that an informant with a "standing arrangement" to provide information about drug sales in exchange for payment brought the informant "within the meaning of an agent of law enforcement officials as contemplated by the entrapment statute" applicable to inducements "if law enforcement officials[] act[] either directly or through an agent"; the fact that officer "had no knowledge of or involvement with" the informant's methods should not insulate the government from responsibility for those methods" (internal quotation marks omitted)); *Dial v. State*, 799 So. 2d 407, 408, 409-10 (Fla. Dist. Ct. App. 2001) (holding that defendant had been entrapped by an informant who worked with law enforcement in exchange for leniency on her own sentence but was "left to her own devices" and was not supervised by law enforcement in "creat[ing] a crime where none existed"). *See*

---

of such chicanery; the defense of entrapment cannot be defeated because the trapping was perpetrated by a Government surrogate.").

*generally* 2 Wayne R. LaFave, *Substantive Criminal Law* § 9.8(a) (3d ed. 2022) ("entrapment can occur through an undercover agent, a confidential informant[,] or a private citizen knowingly acting under the direction of government agents. . . . [A] sufficient agency relationship can exist even when the police did not expressly request the particular inducement techniques later challenged via an entrapment defense." (footnotes and internal quotation marks omitted)); Model Penal Code § 2.13 (Am. L. Inst. 2022) ("A public law enforcement official or a person acting in cooperation with such an official perpetrates an entrapment if for the purpose of obtaining evidence of the commission of an offense, he induces or encourages another person to engage in conduct constituting such offense . . ."). Some courts begin their analysis with a rule similar to the one voiced by the trial court in this case, but reasonably go on to a totality of the circumstances fact-based approach when it comes to applying entrapment law in individual cases. *See, e.g.*, *United States v. Jones*, 231 F.3d 508, 517 (9th Cir. 2000) (for entrapment purposes, "[a] person is a government agent when the government authorizes, directs, and supervises that person's activities and is aware of those activities. Factors in determining whether a person is a government agent include the nature of that person's relationship with the government, the purposes for which it was understood that person might act on behalf of the government, the instructions given to that person about the nature and extent of permissible activities, and what the

government knew about those activities and permitted or used." (citations and internal quotation marks omitted)); *United States v. Busby*, 780 F.2d 804, 806-07 (9th Cir. 1986) (holding evidence was insufficient to establish that informant was government agent for purposes of entrapment where informant's actions "were not directed" at initial meeting with officer, and officer was "wholly unaware" of informant's activities, informant's subjective expectation that he would be paid for information was based on prior experience as a paid informant with "other state and federal agencies," and police made only informal request for drug information informant obtained in the future; informant offered information in exchange for fixing a parking ticket but there was no deal when informant refused to testify).

A functional analysis of who is an "agent" of the government furthers the objective of the entrapment defense, which is "designed to overcome" the "evil" that occurs when the government "plays on the weaknesses of an innocent party and beguiles him into committing crimes which he otherwise would not have attempted." *Sherman*, 356 U.S. at 376. "[T]he 'purpose of the defense is to deter misconduct in enforcing the law.'" 2 LaFave, *Substantive Criminal Law* § 9.8(a) (quoting Model Penal Code § 2.13). There is obviously official misconduct, as the trial court thought, when law enforcement officers direct a non-government person to entice another into committing a crime. However, the defense's purpose to deter government overreach is also thwarted when the government relies on an

unsupervised but incentivized informant who uses impermissible methods, then seeks to defeat the defense by "disown[ing]" the person who effectuated those methods. *Sherman*, 356 U.S. at 373.[9] Put differently, a defendant has a viable entrapment defense if there is an adequate basis to conclude that the government should be held responsible for the conduct of an informant who induces the criminal activity the accused was not predisposed to commit. That allocation of responsibility

---

[9] The Supreme Court fleshed out the rationale in *Sherman*:

> The Government cannot disown Kalchinian and insist it is not responsible for his actions. Although he was not being paid, Kalchinian was an active government informer who had but recently been the instigatory of at least two other prosecutions. Undoubtedly the impetus for such achievements was the fact that in 1951 Kalchinian was himself under criminal charges for illegally selling narcotics and had not yet been sentenced. It makes no difference that the sales for which petitioner was convicted occurred after a series of sales. They were not independent acts subsequent to the inducement but part of a course of conduct which was the product of the inducement. In his testimony the federal agent in charge of the case admitted that he never bothered to question Kalchinian about the way he had made contact with petitioner. The Government cannot make such use of an informer and then claim [disassociation] through ignorance.

*Sherman*, 356 U.S. at 373-74 (footnotes omitted).

can be grounded on an ongoing symbiotic relationship, usually fueled by financial and other inducements to the informant in exchange for information.[10]

We, therefore, hold that the trial court erred as a matter of law in determining that appellant's entrapment defense would necessarily fail without evidence that the police directed the specific activities of the alleged informant. Because that erroneous ruling was the premise for the trial court's denial of the motion for disclosure of the informant's identity, the denial was an abuse of discretion. *See Jones*, 17 A.3d at 631 ("[T]he exercise of discretion must be founded on correct legal principles.").[11]

---

[10] The Council of the District of Columbia has also indicated its understanding of entrapment as encompassing the acts of third parties "cooperating with" law enforcement in a proposed comprehensive overhaul to the District of Columbia Criminal Code. Revised Criminal Code Act of 2022, D.C. Act 24-416, § 22A-503 (2023) (as passed by D.C. Council, Nov. 15, 2022; vetoed by Mayor, Jan. 3, 2023; mayoral veto overridden by Council, Jan. 17, 2023) ("It is an affirmative defense that, in fact, a law enforcement officer acting under color or pretense of official right, *or a person cooperating with a law enforcement officer acting under color or pretense of official right* . . . [p]urposely commanded, requested, tried to persuade, or otherwise induced the actor to engage in the conduct constituting the offense." (emphasis added)). The proposal for a comprehensive overhaul of the District of Columbia Criminal Code was overridden by Congressional action and has not become law in the District of Columbia. H.J. Res. 26, 118th Cong. (2023).

[11] The defense motion for disclosure referred to informants, whether or not they might be called as witnesses, who would be biased because they were offered inducements or felt they were at risk of prosecution themselves if they did not cooperate. Appellant makes that argument in passing in his Reply Brief on appeal,

We do not finally decide whether the actions appellant says the confidential informant took to set him up with a gun made the informant a "government agent" such that they should be attributable to the government for purposes of the entrapment defense. That is, in the first instance, for the trial court to develop in its fact-intensive inquiry and, pursuant to an entrapment instruction, ultimately for the jury. It is enough to say, based on Sgt. Sloan's vouching for the informant's reliability in providing information leading to arrests at the suppression hearing and testimony at trial about a series of substantial payments made to the informant for such tips, including in this case, that there was an established mutually beneficial relationship of at least two years standing between MPD and the informant.[12] This more than sufficed to trigger a careful *Roviaro* inquiry into the relevance of informant's identity to the entrapment defense.

---

citing *United States v. Bagley*, 473 U.S. 667, 682 (1985) and *Williams v. United States*, 881 A.2d 557, 562 (D.C. 2005), but his focus is on the importance of the informant to the entrapment defense. We similarly concern ourselves with that issue.

[12] Sgt. Sloan testified that some time prior to receiving the tip about appellant, he had "[a] conversation with [the informant] and Off. Cuevas as to what [the informant] was capable of, the type of information [the informant] had provided and was able to provide and the reliability of [the informant] with Off. Cuevas." After working with the informant in appellant's case, Sgt. Sloan also used the informant another time, and paid $950 for information.

## III.  Entrapment Defense.

The government proposes we can avoid the *Roviaro* issue altogether.  It offers another ground for concluding that appellant could not have an entrapment defense, making the informant's identity irrelevant.  Under the government's view of the case, we should consider only the short period when the officers approached appellant in the car and appellant acknowledged he had a gun, which they then seized from his waistband.  In this foreshortened view, even if the informant cajoled appellant to give him a ride and left the gun, appellant had no viable entrapment defense because he was alone in the car with the gun when the officers stopped him, and no one "induced him to pick up the firearm, make sure it was properly loaded, and then stick it into this gun and place it in his waistband."  Thus, he knowingly and voluntarily possessed the gun and there was no entrapment.

We disagree.  We think a reasonable jury could find that appellant possessed the gun (this was conceded) *and* was entrapped if it found there were adequate grounds to hold the government responsible for the informant's conduct and credited appellant's testimony that the informant was Caine, who pressed and enticed him to drive that day so Caine could plant the gun in his car and then report him to the police for a monetary reward.  That there was evidence sufficient to prove the elements of gun possession did not render an entrapment defense unviable.  The

premise of the government's argument falters because the entrapment defense assumes that an offense has occurred—but the defendant's criminal liability is negated by impermissible conduct attributable to the government. *See Sherman*, 356 U.S. at 380 (Frankfurter, J., concurring) ("The courts refuse to convict an entrapped defendant . . . because, even if his guilt be admitted, the methods employed on behalf of the Government to bring about conviction cannot be countenanced."); *State v. Bisson*, 491 A.2d 544, 547 n.1 (Me. 1985) ("The State's argument is predicated on a misconception of the rationale for the entrapment defense. Entrapment does not negate a culpable state of mind."). "It is therefore the attempt to deter wrongful conduct on the part of the government that provides the justification for the defense of entrapment, not the innocence of the defendant." Model Penal Code § 2.13 cmt. 1 (Am. L. Inst. 1962). Rather, appellant's conduct checking the gun and tucking it into his waistband created a jury question about his predisposition to commit the crime, which, if present, would undermine the entrapment defense. *Cf. Savage*, 313 A.2d at 884 (noting that possession of weapon "extended over a considerable period of time and was clearly illegal," such that possession of the weapon was knowing and voluntary rather than the result of an entrapping "artifice or stratagem").

In evaluating the viability of appellant's entrapment defense at this preliminary stage, we also consider the ultimate burden of proof at trial. When "the defense of entrapment is at issue . . . the prosecution must prove beyond [a]

reasonable doubt that the defendant was disposed to commit the criminal act *prior to first being approached by Government agents.*" *Jacobson v. United States*, 503 U.S. 540, 549 (1992) (emphasis added). A jury could well entertain doubt on that score in light of Caine's alleged repeated insistent calls and financial offer to overcome appellant's reluctance to drive Caine that day. Appellant stipulated to a prior conviction for armed robbery, but it was ten years old, and he testified he was acutely aware that, as a felon, he should not be around guns and had taken steps to turn his life around.

In short, we are not persuaded that we can overlook the legal error in the trial court's denial of the motion to disclose the informant's identity on the ground that appellant had not shown that the informant acted under the direction of the government. As this misapprehension led the trial court to deny the motion for disclosure of the informant's identity, we reverse and remand.

## IV. Remand.

On remand, the trial court should consider the evidence adduced at trial in reconsidering the request for disclosure of the informant's identity and "carefully balance the government's interest in nondisclosure with the defendant's right to prepare a defense." *Sturgess*, 633 A.2d at 62. The threshold question is whether Caine was the informant. A determination that the informant was not Caine likely

would forestall further inquiry.  But if the informant was Caine, it is evident that he could provide evidence about whether he offered inducements to appellant or cajoled him to provide a ride and whether appellant was initially reluctant to do so.  The informant could help elucidate the important question of where the gun came from. The informant could provide details about his relationship with MPD that, as this opinion explains, would be relevant in determining whether the informant's actions should be attributable to the government for purposes of the entrapment defense, such as inducements (financial and otherwise) he received and how much the officers knew (or overlooked), and benefitted from, his tactics, not just in this case but over time.  The informant could also provide information as to how he knew the gun was in appellant's car, whether (and, if so, when) he was in the car with appellant and when and where he got out of the car.  Possibly his fingerprints could be compared with the two unidentified fingerprints on the gun; calls and texts on his phone might be available to ascertain when he contacted appellant for a ride and when he called Sgt. Sloan with the tip relative to when the officers arrived and arrested appellant. *See United States v. Gutierrez*, 931 F.2d 1482, 1490 (11th Cir. 1991) (noting that the three factors to consider in applying the *Roviaro* balancing test are: "the extent of the informant's participation in the criminal activity, the directness of the relationship between the defendant's asserted defense and the

probable testimony of the informant, and the government's interest in nondisclosure.")

The court may conduct its fact-intensive inquiry by means short of outright disclosure to the defense, such as through in camera interviews, having the informant answer written questions under oath, or some other appropriate measure suited to the circumstances, before ruling on appellant's request for the informant's identity. *See Sturgess*, 633 A.2d at 58, 62; *Savage*, 313 A.2d at 883, 833 n.5. If, after such inquiry, the trial court determines that "fundamental requirements of fairness" dictate that "disclosure of the informer's identity, or of the contents of his communication, is relevant and helpful to the defense . . . or is essential to a fair determination of a cause, the privilege must give way." *Roviaro*, 353 U.S. at 60-61.

\* \* \*

We reverse the trial court's ruling denying appellant's motion for disclosure and remand the case for further proceedings consistent with this opinion.

*So ordered.*

MCLEESE, *Associate Judge*, concurring in part and concurring in the judgment: I agree with the holding of the court, and I join the opinion of the court except for note 10 and the discussion on page 29 about various possible factual scenarios that might arise on remand.